## THE KESTOR.

(District Court, D. Delaware. August 7, 1901.)

### No. 616.

SEAMEN—PREPAYMENT OF SEAMEN—CONSTITUTIONAL LAW.

Section 24 of the act of congress of December 21, 1898, entitled "An act to amend the laws relating to American seamen, for the protection of such seamen, and to promote commerce" (30 Stat. 755), in prohibiting the prepayment of the wages of seamen, is a constitutional enactment, applying to the prepayment on American soil or in American waters of the wages of seamen, who are British subjects, shipping in American ports on British merchant vessels; there being no treaty between the United States and Great Britain inconsistent with such application.

(Syllabus by the Court.)

In Admiralty.

Robert Penington and Joseph Hill Brinton, for libelant.
Charles M. Curtis, for respondent.

BRADFORD, District Judge. The libel in this case was filed by William Chambers against the steamship Kestor for the recovery of seaman's wages. On September 2, 1899, that vessel, being destined on a voyage from Baltimore to Mexico, Cuba and Philadelphia, and thereafter on another voyage from Philadelphia to Cuba and to some port in the United States north of Cape Hatteras, the libelant signed shipping articles to serve on her as fireman. The wages he was to receive were stated in the articles as "one shilling for the first twenty days and thirty dollars per month afterwards."

On the day next following that on which he signed the articles he entered on his employment and continued to serve in the capacity of fireman until he was discharged in Philadelphia November 19, 1899, having served two months and seventeen days. At the time he was employed the Kestor was a British merchant vessel sailing under the British flag, and the libelant was a British subject. It is admitted that the libelant received on account of his wages for the two voyages money and supplies amounting to $20.82. The claimant contends that the balance due to the libelant, after deducting the above amount, was at the time of his discharge $36.18. At the time of his discharge the latter amount was tendered or offered to the libelant in full satisfaction of his claim; but he refused to accept the same, alleging that he was entitled to receive $20 more than the sum so tendered or offered. It is admitted that the sum so tendered or offered and refused was deposited with the British consul at Philadelphia November 21, 1899, subject to the order of the libelant, prior to the filing of the libel in this cause, and that "subsequently the British consul forwarded the same to the London Board of Trade pursuant to the British Shipping Act to the credit of said libelant." The basis on which the claimant arrives at the amount admitted by him to be due to the libelant is that the latter was entitled to receive only $10 during the first month, $30 during the second month and $17 for the remaining seventeen days, amounting in the aggregate to $57, which, after deducting the credit of $20.82, leaves a balance of $36.18. The libelant claims that, notwithstanding the language of the shipping articles, he was entitled to receive wages at the rate of $30 a month during the whole period of his service, and that allowing for the above credit there was due to him at the time of his discharge $56.18. For the recovery of the latter amount with interest he filed his libel.

By section 24 of the act of congress of December 21, 1898, entitled "An act to amend the laws relating to American seamen, for the protection of such seamen, and to promote commerce" (30 Stat. 755), section 10 of the act of June 26, 1884, entitled "An act to remove certain burdens on the American merchant marine and encourage the American foreign carrying trade and for other purposes" (23 Stat. 53), as amended by section 3 of the act of June 19, 1886, entitled "An act to abolish certain fees for official services to American vessels, and to amend the laws relating to shipping commissioners, seamen, and owners of vessels, and for other purposes" (24 Stat. 79), was further amended so as to read, so far as material to be considered in connection with this case, as follows:

"Sec. 10. (a) That it shall be, and is hereby, made unlawful in any case to pay any seaman wages in advance of the time when he has actually earned the same, or to pay such advance wages to any other person. Any person paying such advance wages shall be deemed guilty of a misdemeanor, and upon conviction shall be punished by a fine not less than four times the amount of the wages so advanced, and may also be imprisoned for a period not exceeding six months, at the discretion of the court. The payment of such advance wages shall in no case, excepting as herein provided, absolve the vessel or the master or owner thereof from full payment of wages after the same shall have been actually earned, and shall be no defense to a libel, suit, or action for the recovery of such wages. If any per-

son shall demand or receive, either directly or indirectly, from any seaman or other person seeking employment as seaman, or from any person on his behalf, any remuneration whatever for providing him with employment, he shall for every such offense be liable to a penalty of not more than one hundred dollars. * * * (f) That this section shall apply as well to foreign vessels as to vessels of the United States; and any master, owner, consignee, or agent of any foreign vessel who has violated its provisions shall be liable to the same penalty that the master, owner, or agent of a vessel of the United States would be for a similar violation: Provided, That treaties in force between the United States and foreign nations do not conflict."

This section, subject to certain exceptions and provisos not pertinent in this connection, makes it "unlawful in any case to pay any seaman wages in advance of the time when he has actually earned the same, or to pay such advance wages to any other person," and provides that such payment "shall in no case * * * absolve the vessel or the master or owner thereof from full payment of wages after the same shall have been actually earned, and shall be no defense to a libel, suit, or action for the recovery of such wages." The libelant contends that the provisions of the above section are applicable to the prepayment of the wages of a British seaman employed to serve on a British merchant vessel; that he was entitled to wages at the rate of $30 a month from the commencement of his service; and that $20 of his wages for the first month were paid by the master in violation of the statute. The claimant, on the other hand, contends that the statute was not intended to apply to the prepayment of the wages of a British seaman serving on a British vessel; that, if it was intended to have such application, it was to that extent beyond the power of congress to enact; and that, on the assumption that the statute is operative in such a case, all the wages to which the libelant was entitled were specified in the shipping articles and consequently there was no violation of the statute. According to a literal construction of the shipping articles the wages of the libelant were fixed at "one shilling for the first twenty days and thirty dollars per month afterwards." But this circumstance is not necessarily decisive of the case. A provision in a contract designed and calculated to secure or facilitate the doing of what by statute is declared unlawful and made a misdemeanor punishable by fine and imprisonment is a nullity. Whatever may be the form of such provision and however innocent on its face, it merits and receives the condemnation of the law. If the stipulation of "one shilling for the first twenty days" was intended as a cover for the unlawful prepayment of any portion of the libelant's wages "to any other person," it was unlawful and void. It could derive no vitality from the fact that the libelant when signing the articles was of full age and sound mind. He could not validly contract for the prepayment of his wages to himself or to another. Such prepayment was denounced by the statute, on the assumption that it is operative in the case of British seamen shipping in American ports on British vessels. If prior to the signing by the libelant of the shipping articles the parties regarded thirty dollars a month during the period of service as only a fair, reasonable and just measure of compensation by way of wages,

and the libelant was induced by the master or by any other representative of the vessel to forego the receipt or consent to a relinquishment of his right to a portion of such compensation by submitting to a stipulation that he should receive for the first twenty days only one shilling, and if he was so induced with intent on the part of the master or such representative to prepay within the limits of the United States the amount so sought to be relinquished or foregone to any person or persons other than the libelant, whether by way of bonus or commission for the furnishing of the libelant to the vessel, or by way of the settlement in whole or in part of any indebtedness contracted by the libelant, such intent was unlawful and the amount so intended to be prepaid was "wages" within the true intent and meaning of the statute. For in such case it must be assumed that, were it not for such bonus, commission or indebtedness, the master would have undertaken to pay the libelant as wages what was regarded as the proper measure of compensation during the whole period of his employment, and no stipulation of one shilling for the first twenty days would have been inserted in the articles. And in such case it is immaterial, in my opinion, whether the libelant was aware or ignorant of such unlawful intent on the part of the master or other representative of the vessel. In either event the prepayment, in accomplishment of that unlawful purpose, of a portion of the wages to which he was primarily entitled, was within the mischief at which the statute was aimed, if it be operative in the case of British subjects employed in American ports to serve as seamen on British merchant vessels, was a violation of its provisions, without legal effect as a payment, and cannot serve to relieve the vessel or master from liability to the libelant for the amount of wages so wrongfully applied. Those who attempt fraudulently to evade the provisions of a penal statute usually resort to indirection, secrecy and concealment, and in most instances it is necessary mainly, if not wholly, to rely on circumstances attending the transaction to shed light on its real nature. Direct evidence of the fraud is obtainable in comparatively few cases. There is no evidence showing or tending to show that $30 were in excess of just compensation to the libelant for a month's service, or that he was taken on trial for the first twenty days and his wages during that period accordingly fixed at one shilling; nor that he was incompetent. The libelant testifies that he was employed at $30 a month, and that rate after the first twenty days was in fact provided for in the articles irrespective of the length of the service, and there is nothing, consistent with an innocent intent, to show any reason why the libelant's wages for the first twenty days should have been specified in the articles as one shilling. It is wholly unreasonable that such a discrimination between the rate of compensation for the first twenty days and the rate of compensation thereafter should have been arbitrarily made bona fide. Such a provision on its face requires a satisfactory explanation, but none has been given. On the contrary, the circumstances of the transaction negative the claim that the full amount of compensation which should become due to the libelant was specified in the articles. It is evident that

the master did not regard one shilling as the real wages of the libelant for the first twenty days; for that amount has not been paid to him nor was it included in the sum offered or tendered to him at the time of his discharge. The idea that the libelant whose services were worth $30 a month was expected by the master to serve for the first twenty days without earning any compensation, either to be paid to him as wages, or otherwise to be applied in connection with his employment, is inadmissible. It does not accord with the known rules of human conduct. The libelant is an illiterate man who can neither read nor write. Although he signed the articles with knowledge that there was a stipulation that he should receive one shilling for the first twenty days, it abundantly appears that he protested against the withholding of the $20 representing that period, and regarded it as a wrongful deduction from his wages. A portion of his testimony is as follows:

"Q. Where were you paid off? A. I ain't paid off yet, sir. Q. Did you demand your money? A. I asked the captain when I left Cuba and he wanted to pay me off $20 short, but I refused to take the money because he give it to a boarding master. Q. Where was that refusal made? A. In Philadelphia, sir. Q. Before whom? A. British consul. Q. How much money was offered to you? A. $36.18. Q. How much money was coming to you? A. $56.18. * * * Q. Did you or not at that time demand the payment of the sum of $56.18? A. I told him I wanted $56.18, and he would not give it and I took my account of wages and went off. * * * Q. Did you have any further conversation with the consul? A. No, sir. He said, 'You've been in a boarding-house before and you know right well what you are signing for. You are one of those boarding house kickers. Get out;' and I went out. * * * Q. Where did the dispute come in, fireman, between you and the master about this twenty dollars? A. He wanted to deduct it from me. Q. Why did he claim the right to deduct it? A. That is what I want to know. Q. Did he not give you any reason? A. No, sir. He said I signed for a shilling for the first twenty days. Q. Well, did you not? A. Yes, sir. Q. Well then, if you signed for a shilling for the first twenty days why did you want $20.18 additional to a shilling? A. I want to know where that money went, if he paid that money for me he had no right to. Q. Now you say you signed for a shilling and you want $20.18 additional notwithstanding that? A. He reduced it $20. I want the $20, and not the eighteen cents at all. * * * Q. You say that you were told by the British consul in Baltimore that you were to get a shilling for the first twenty days? A. Yes, sir."

A portion of the testimony of the master, who was the only other witness than the libelant, is as follows:

"Q. 29. Where was he discharged; before what? A. At Philadelphia. Q. 30. Before the British consul in Philadelphia? A. Yes, sir. Q. 31. Did he get his money? A. It was offered to him. Q. 32. How much? A. Thirty six dollars and eighteen cents. Q. 33. Did he accept it? A. No, sir. Q. 34. What did he say as to accepting it? A. He said it was wrong. He said his account of wages was wrong. * * * Q. 57. What did he state to you as the error in the account? A. While in the consul's office, with the other men that appeared there, he was not sober. He seemed to be excited and spoke about his account being wrong; that his account of wages was wrong and something about advances, and that he had not had all the money. But the consul ordered him out of the office as he was not civil and did not conduct himself with courtesy."

Not only does it appear from the above testimony that the libelant regarded the refusal to pay him for the first twenty days as a wrongful withholding from him of just compensation, but the testimony of

the master on cross examination strongly tends to show a violation of the statute. He testifies, in part, as follows:

."X. 160. Who brought you into contact with the libelant in Baltimore? A. In what way do you mean? X. 161. Any way you please? (Objected to.) A. By an agent. X. 162. Who? A. You mean the name? X. 163. Yes? A. A representative of the firm of Goodhues— X. 164. And Tarley? A. I forget the other name. X. 165. Who are they? (Objected to.) A. People engaged in the shipping business. * * * X. 168. What is their business? A. His business is to assist in getting a crew. X. 169. And he assisted you, I suppose, in getting the libelant as a member of your crew? A. Yes. sir. X. 170. Under what agreement? (Objected to.) A. Private terms. X. 171. What are those private terms? A. Commission. X. 172. What is the commission? A. I decline to state. X. 173. I insist upon an answer unless you are willing to swear that it will incriminate you? A. My answer is that my business with other people has nothing whatever to do with the plaintiff in this case. Mr. Brinton: Mr. Vandegrift, I ask that you instruct the witness to answer the question. Mr. Vandegrift: I would sustain the witness in the position he has taken. * * * X. 174. What was your agreement with the agent of Goodhues and Company with reference to the shipping of Chambers, the libelant, in this case, as a member of your crew, in Baltimore, on September second, 1899? Mr. Vandegrift: If you see fit to let me advise privately with the witness he may be willing to answer that question. Mr. Brinton: I have every confidence, of course, in you, but I do not think it is quite the fair thing to do. Mr. Vandegrift: I thought we might overcome the difficulty, that is all, if he could tell me what his position in the matter was. A. I decline to give any one other than my owners any knowledge of my business, except what was officially done in the consul's office in Baltimore on that occasion. X. 175. I insist upon an answer? A. I must decline to give an answer.

Further, the claimant has not produced as a witness the consul at Baltimore, the consul at Philadelphia, or the shipping-master or agent, nor has he attempted to account for his failure to do so, although two, if not all of them, it fairly may be assumed, would from their connection with the transaction have been important witnesses for him if his present contention were founded on fact. On the whole I am satisfied that the insertion of the stipulation of one shilling for the first twenty days was a mere cover for an attempted evasion of the statute, and that the master violated its provisions by paying in the port of Baltimore a portion of the libelant's wages in advance of the time when he actually earned the same to a person or persons other than the libelant.

I now come to the question whether the statute was intended to apply to the case of British subjects shipping in the United States on British vessels, in the absence of any treaty between the United States and Great Britain inconsistent with such application. In U. S. v. Nelson (D. C.) 100 Fed. 125, decided in the district court for the southern district of Alabama, Judge Toulmin, with reference to the section in question, said:

"That the statute applies to American seamen,—Americans whose avocation is that of mariner,—only, is, I think, clear."

This is all that was said on the subject and seems to have been obiter; as nothing appears in the case, as reported, from which it can be inferred that the question of the application of the statute to foreign seamen shipping on vessels in American ports was involved. In The Eudora, 110 Fed. 430, in the district court for the Eastern

district of Pennsylvania, however, the point under discussion was directly decided. Judge McPherson said:

"The act of 1898 does not apply to the libelants because the statute, as its title declares, is intended to 'amend the laws relating to American seamen, for the protection of such seamen, and promote commerce.' "

These are the only cases, so far as I am aware, in which it has been decided or said that the statute applies to American seamen only, and in both of them the court evidently relied on its title in reaching that conclusion. It is well settled that the title of a statute may sometimes be resorted to as tending to throw light upon the legislative intent as to its scope and operation. U. S. v. Fisher, 2 Cranch, 358, 386, 2 L. Ed. 304; Holy Trinity Church v. U. S., 143 U. S. 457, 462, 12 Sup. Ct. 511, 36 L. Ed. 226; Coosaw Min. Co. v. South Carolina, 144 U. S. 550, 563, 12 Sup. Ct. 689, 36 L. Ed. 537; Knowlton v. Moore, 178 U. S. 41, 65, 20 Sup. Ct. 747, 44 L. Ed. 969. But to warrant such a course, its language must be ambiguous or otherwise doubtful, or being plain, a literal construction would lead to such absurdity, hardship or injustice, as to render it irrational to impute to the legislature an intent to produce or permit such a result. In U. S. v. Fisher, supra, the court through Chief Justice Marshall said:

"Neither party contends that the title of an act can control plain words in the body of the statute; and neither denies that, taken with other parts, it may assist in removing ambiguities. Where the intent is plain, nothing is left to construction. Where the mind labors to discover the design of the legislature it seizes everything from which aid can be derived; and in such case the title claims a degree of notice, and will have its due share of consideration."

The language of the section under consideration is plain and wholly free from ambiguity or other uncertainty. Except as therein provided, it is declared unlawful "in any case to pay any seaman wages in advance of the time when he has actually earned the same, or to pay such advance wages to any other person," and provides that "any person paying such advance wages," shall be guilty of a misdemeanor. The words "any seaman" in the absence of restriction apply as well to a foreign as to an American seaman. No such restriction is expressed in the statute. Nor would the enforcement of the provision according to its terms in the case of a foreign seaman work any hardship or injustice. Protection to seamen is one of the beneficent purposes of the act, and the extension to foreign seamen shipping in American ports of the same protection as is accorded to American seamen involves no hardship or injustice to the former. In U. S. v. Fisher, it was held that section 5 of the act of March 3, 1797, giving a preference to the United States in cases of insolvency was not confined to persons accountable for public money, but extended to debtors of the United States generally. Yet the title of the act was "An act to provide more effectually for the settlement of accounts between the United States and receivers of public money," and Chief Justice Marshall said:

"The title of the act is unquestionably limited to 'receivers of public money'; a term which undoubtedly excludes the defendant in the present case."

But the language of the section applied to "any revenue officer, or other person, hereafter becoming indebted to the United States by bond or otherwise" who should become insolvent or whose assets after his death should be insufficient to pay all debts due from the deceased. The court in discussing the section said:

"That these words, taken in their natural and usual sense, would embrace the case before the court, seems not to be controverted. 'Any revenue officer, or other person, hereafter becoming indebted to the United States by bond or otherwise,' is a description of persons, which, if neither explained or restricted by other words or circumstances, would comprehend every debtor of the public, however his debt might have been contracted."

In the present case a fortiori the title should not be held to control the plain language of the section and restrict the words "any seaman" to "any American seaman." In U. S. v. Fisher, the title was "unquestionably limited to 'receivers of public money.'" Here the title is "An act to amend the laws relating to American seamen, for the protection of such seamen, and to promote commerce." The act contains twenty six sections, most of which beyond controversy apply to foreign as well as American seamen employed on American vessels. Those sections in which no discrimination is made between foreign and American seamen clearly are in harmony with the title of the act and were intended "to promote commerce," and, as will presently be shown, were in their application to foreign as well as American seamen principally intended "for the protection" of the latter. The section under consideration admittedly was intended to apply to the prepayment of the wages of an American seaman shipping in an American port on an American merchant vessel; and no reason is perceived why the words "any seaman" as employed in the section should be so wrested from their "natural and usual sense" as to exclude a foreign seaman shipping here on such an American vessel, or why the application of its provisions in such case would not be quite as much in harmony with the title of the act as are many of the other sections which do not discriminate between foreign and American seamen employed on American vessels. The case before the court is one in which a British seaman shipped in an American port on a British vessel. It is expressly provided that the section shall apply "as well to foreign vessels as to vessels of the United States" provided "that treaties in force between the United States and foreign nations do not conflict." There is, so far as I am aware, no conflicting treaty between the United States and Great Britain. It is not controverted that the section was intended to apply to the case of an American seaman shipping in an American port on a British vessel; but it is claimed that it was not intended to apply to a British seaman shipping here on such a vessel. Certainly the language of the section is broad enough to cover such a case, and if, as hereafter appears, its application to such cases would operate for the protection of American seamen, it would accord not only with the title of the act, but with the plain terms of the section, so to apply it. A review of the legislation on the subject affords very persuasive evidence that the words "any seaman" as used in the section were the deliberate and well considered ex-

pression of congress, intended to have their usual and natural effect and consequently to apply to seamen regardless of their nationality. Section 10 of the act of June 26, 1884, entitled "An act to remove certain burdens on the American merchant marine and encourage the American foreign carrying trade and for other purposes" (23 Stat. 53), subject to certain exceptions and provisos, not pertinent to this case, provided among other things as follows:

"Sec. 10. That it shall be, and is hereby, made unlawful in any case to pay any seaman wages before leaving the port at which such seaman may be engaged in advance of the time when he has actually earned the same, or to pay such advance wages to any other person, or to pay any person, other than an officer authorized by act of congress to collect fees for such services, any remuneration for the shipment of seamen. Any person paying such advance wages or such remuneration shall be deemed guilty of a misdemeanor, and, upon conviction, shall be punished by a fine not less than four times the amount of the wages so advanced or remuneration so paid, and may be also imprisoned for a period not exceeding six months, at the discretion of the court. The payment of such advance wages or remuneration shall in no case, except as herein provided, absolve the vessel, or the master or owner thereof, from full payment of wages after the same shall have been actually earned, and shall be no defense to a libel, suit, or action for the recovery of such wages. * * * This section shall apply as well to foreign vessels as to vessels of the United States; and any foreign vessel, the master, owner, consignee or agent of which has violated this section, or induced or connived at its violation, shall be refused a clearance from any port of the United States."

Thus at the inception of the legislation on the subject congress by one act not only prohibited the prepayment except as therein provided, of the wages of "any seaman", but provided that the section containing the prohibition "shall apply as well to foreign vessels as to vessels of the United States". Had congress intended that the words "any seaman" should not have their natural effect and apply to a foreigner shipping in an American port on a foreign vessel, or had congress not intended that those words should have such application, it is somewhat remarkable, especially in view of the fact that the same section in which those words occur contains the declaration that foreign vessels should be subject to its provisions, that no proviso was added to the concluding clause or elsewhere inserted to the effect that the section should not apply to foreign seamen shipping on foreign vessels. There was nothing ambiguous or doubtful in the language of the section and its application to seamen of whatever nationality shipping in American ports on foreign merchant vessels would have been in strict accord with its terms and would not have been inconsistent with its title, including, as it did, the words "and for other purposes". By section 3 of the act of June 19, 1886, entitled "An act to abolish certain fees for official services to American vessels, and to amend the laws relating to shipping commissioners, seamen, and owners of vessels, and for other purposes" (24 Stat. 79), the last clause of section 10 above quoted was amended so as to read as follows:

"This section shall apply as well to foreign vessels as to vessels of the United States; and any master, owner, consignee, or agent of any foreign vessel who has violated this section shall be liable to the same penalty that a master, owner, or agent of a vessel of the United States would be for a similar violation."

It is evident from this amendatory act that the provisions of section 10 of the original act were carefully considered and revised. Changes of an important character were made, and, among others, the clause relating to the applicability of the section to foreign vessels received attention and amendment. But it was not provided that the section should not apply to foreign seamen shipping on foreign vessels. The words "any seaman" were left wholly unqualified and unrestricted in the same section which declared that its provisions were applicable to foreign vessels. Nor was the title of the amendatory act repugnant to the idea that those words were employed in their usual and broad sense. Thus stood the law on the subject at the time of the enactment of section 24 of the act of December 21, 1898, on which the libelant relies. This section amended in important particulars section 10 of the original act as amended by section 3 of the act of June 19, 1886. The original section as theretofore amended was re-arranged, new provisions were added, and to the clause applying it to foreign vessels was attached the proviso, "that treaties in force between the United States and foreign nations do not conflict." This proviso, it is obvious, is quite as appropriate where foreign seamen ship in American ports on foreign vessels, if the statute applies to that case, as where American seamen ship here on foreign vessels. In the statute as it now stands, as in the enactments theretofore in force, there is nothing to negative the universality of the words "any seaman" as inclusive of seamen of all nationalities. The section in its present form is the result of repeated consideration and deliberation on the part of the legislative power, its language is free from ambiguity and its purpose is beneficent, whether applied to foreign seamen and vessels or to American seamen and vessels. To hold that it was not intended to apply to the case of foreign seamen shipping here on foreign merchant vessels, would, in my opinion, impute to congress such oversight or incompetency in the formulation of the enactment as this court cannot assume to have existed. Not only does the section according to its plain terms apply to the case in hand, but there are obvious reasons why it should have such application. The broad purposes of the section, undoubtedly, were the protection of American seamen and the promotion of the welfare of the American merchant marine. The prepayment of seamen's wages, either to them, or to others by way of bonus or commission for supplying them to vessels or on account of indebtedness contracted by them, was found injurious to seamen and detrimental to the merchant service. These were the evils the legislation in question was intended to correct. In The Eclipse (D. C.) 53 Fed. 273, Judge Morrow well said:

"The payment of advance wages to seamen has been one of the great evils of the merchant marine service. It has been one of the methods employed to defraud the seaman out of a large share of his wages, and, prior to congressional legislation upon the subject, courts of admiralty were continually called upon to interpose their power and authority for the protection of the seamen from this method of imposition. The reports are full of cases declaring in the strongest terms against the many schemes that have been devised to obtain possession of the seamen's wages, even under the form of law."

It was necessary to the most effectual or, indeed, to any substantial accomplishment of the purposes of the section, that a uniform rule should be applied alike to all seamen of whatever nationality shipping in American ports on vessels whether American or foreign. To apply the rule to American seamen shipping on American or foreign vessels, and to foreign seamen shipping on American vessels, but to deny its application to foreign seamen shipping on foreign vessels, would open wide the door to fraudulent evasions of the law, produce uncertainty and embarrassment in its enforcement and largely defeat its purpose. It would lead in many instances to misrepresentation of their nationality by American seamen shipping on foreign vessels, resulting in the prepayment of their wages contrary to the provisions of the section, and to the fraudulent violation of such provisions by masters and agents of foreign vessels through the prepayment of the wages of American seamen on the pretense that they were foreigners. American seamen would thus be deprived of the protection which it is the purpose of the statute, as indicated by its title, to accord them. Further, such a narrow construction of the section would on the prosecution of "any master, owner, consignee, or agent of any foreign vessel who has violated its provisions" necessitate proof on the part of the government of the scienter as to the nationality of the seamen, and such proof frequently would be difficult, if not impossible, to furnish. But if the section be held to apply uniformly to all seamen of whatever nationality shipping in American ports on merchant vessels whether American or foreign, the difficulties, evasions and frauds, induced by or resulting from the narrower construction contended for, are removed and the law will serve as a much more efficient instrument for the accomplishment of the broad purposes for which it was intended. A discrimination between American citizens and the citizens or subjects of friendly foreign powers with respect to the measure of protection to be accorded to them while on our soil for lawful purposes or in the pursuit of their lawful avocations, also seems repugnant to the genius of the American people and to the spirit of equality pervading our laws. For the reasons given I am satisfied that the provisions of the section were intended to apply to the case of foreign seamen shipping in American ports on foreign merchant vessels.

The next question relates to the constitutionality of the section in its application to such a case. In Patterson v. The Eudora, already referred to, it appears that a majority of the libelants were of foreign nationality and the rest American citizens. They shipped as seamen on a British vessel in the port of New York, a portion of their wages being prepaid to the shipping agent through whom the master employed them. The prepayment was made on account of their indebtedness to the shipping agent for board and goods furnished by him to them. They filed their libel to recover wages without deduction of the amount prepaid. The libel was dismissed. The court held that the section was intended to apply only to American seamen; that it has no application to seamen "even if they are American by birth or naturalization, that have regularly shipped

upon a British vessel, and have thereby become British seamen for the time being"; and that, therefore, all of the libelants were outside of its provisions. It was further held that it was not in the power of congress to apply the provisions of the section to any of the libelants. On this point it was said:

"In support of the second proposition, it may be added, that a foreign vessel is a part of the territory of the country to which she belongs, and that congress has no inherent power to control or prescribe rules for her domestic affairs, such as the terms upon which she ships her crew, or the wages she agrees to pay. In certain respects, a foreign ship in our ports is no doubt subject to the laws of the United States, but the government and payment and treatment of the crew are matters that are properly held to concern the ship and crew alone subject to the law of the flag."

Reliance was had on Ross v. McIntyre, 140 U. S. 453, 11 Sup. Ct. 897, 35 L. Ed. 581, as supporting the conclusions reached by the learned district judge. On the other hand, in U. S. v. Nelson (*D.* C.) 100 Fed. 125, already referred to, the court, while stating obiter that the section was intended to apply only to American seamen, said:

"To construe the statute as applying to those persons only who ship or engage to ship on American vessels, it seems to me, would give too narrow a construction to it, too small a field for its operation, and make the statute inconsistent with itself and inharmonious as a whole. The statute is designed to protect the seaman from imposition by any person by providing that no portion of his wages shall be paid in advance, and be thereafter deducted from his wages when actually earned, except he stipulates in his shipping agreement for an allotment of an amount to be fixed, and not to exceed one month's wages, out of which allotment any sum justly due to an original creditor for board and clothing, which he may have contracted for prior to his engagement, shall be paid. * * * The statute declares that it is applicable to foreign vessels, and it provides that any master, owner, agent, or consignee who violates its provisions shall be liable to the same penalty that the master, etc., of a vessel of the United States would be, provided that treaties in force between the United States and foreign nations do not conflict. The penalty there referred to is the penalty for paying wages in advance to the seaman, or paying advance wages to any other person unlawfully; and the master, owner, or agent of a foreign vessel is liable to this penalty unless there is a treaty between the United States and the nation to which the vessel belongs in conflict with the statute."

Here is a clear recognition that in the absence of a treaty to the contrary the section applies with full force and effect to the prepayment of the wages of American seamen shipping in an American port on a British merchant vessel. If the section be constitutional as applied to such a case, it is difficult to perceive why congress had not the power to apply the section to the prepayment of the wages of British seamen shipping in American ports on British merchant vessels; for its application to the latter case would not more than its application to the former "regulate the internal affairs of a vessel sailing under a foreign flag." The power, discipline and control possessed by the master of a British vessel as such over her crew, unless otherwise provided by British law, is not affected by the nationality of its members, and the seamen while employed on her, whether citizens of the United States, subjects of Great Britain or citizens or subjects of other foreign powers, are British seamen for the time being and equally subject to his authority. In The State

of Maine (D. C.) 22 Fed. 734, Judge Brown held that section 10 of the act of June 26, 1884, forbidding the advance of seamen's wages, was not applicable to the shipment of seamen in foreign ports. He discussed the power of congress in connection with its provisions, clearly recognizing the existence of such power in the case of the shipment of seamen on foreign vessels in American ports. He said:

"Statutes have no extraterritorial force. The shipment of seamen in a foreign port, and the payment either of advance wages or of bills previously incurred, as in this case, as an advance of wages, are acts done and completed wholly upon foreign soil; and therefore wholly beyond the jurisdiction of this country. If American vessels be treated as a part of the territory of the United States, and within its jurisdiction, though in foreign ports, still, acts like the present, that are not done upon shipboard, but, as I have said, are completed upon land prior to the seaman's coming aboard, and as a means of procuring them to do so, would not be done within the territorial jurisdiction of this country. Every presumption is against the supposition that congress had any intention to legislate in reference to acts done and completed wholly beyond its jurisdiction. * * * The general purpose of this act is indicated by its title. Its various provisions, as well as the well-known circumstances which led to its passage, show that it was passed in order to correct certain practices and to reform certain abuses to which seamen were subject in the ports of this country. * * * The final clause of section 10, which declares that 'this section shall apply as well to foreign vessels as to vessels of the United States', and that in case of violation a clearance shall be refused them, furnishes a specific indication that congress did not in this section refer to the shipment of seamen in foreign ports, but had in view acts done in this country alone. For it is manifest that, as against foreign vessels in foreign ports, not only would this whole section be mere brutum fulmen, but the specific provision just referred to would be wholly inapplicable. Its only possible legal application to foreign vessels would be as regards their acts while within the ports of this country. And as the intent of the section is clear to make no discrimination between foreign vessels and domestic vessels, and as the section as to foreign vessels cannot possibly be applied as regards their acts done in foreign ports, it follows that the whole section must be deemed intended to apply to the ports of this country only."

An act of congress should not be declared void unless its invalidity clearly appears. Where its language is so general as to apply to cases not within the legislative power it must if possible be so construed as to restrict such generality to subjects and objects within that power. Congress has no authority to declare unlawful or provide for the punishment of acts or offences wholly done or committed beyond the territory and jurisdiction of the United States. But with respect to subjects committed to it by the constitution it has full power to declare unlawful and provide for the punishment of acts and offences done or committed within the territory or jurisdiction of the United States. The shipping interests of the country are peculiarly within the province of congress and it has full control over the American merchant marine. That congress had authority to enact a uniform law declaring unlawful and providing penalties for the prepayment on the soil or in the ports of the United States of the wages of seamen of whatever nationality shipping in such ports on vessels of whatever nationality, as detrimental, for the reasons already given, to seamen and the American merchant marine, there can be little or no doubt. I do not regard In re Ross, 140 U. S. 453, 11 Sup. Ct. 897, 35 L. Ed. 581, either in the

points decided or in the language employed by the court, in the least inconsistent with the views now expressed. There, Ross, a British subject, who had shipped as seaman on an American merchant vessel, committed the crime of murder while on board of her in the harbor of Yokohama, he being one of the crew at the time. He was tried, convicted and sentenced to death before the consul general of the United States at Kanagawa, Japan. Two of the questions arising in the case were whether under the treaties of the United States with Japan, and the acts of congress passed in pursuance thereof, the consular court had jurisdiction, and whether the crime was committed within the territorial jurisdiction of the consular court, having been perpetrated on an American vessel, though lying in a Japanese harbor. The power and right of Japan as a sovereign nation to inflict punishment for a crime against its laws committed in its waters were not the subject of controversy. The court, through Mr. Justice Field, among other things, said:

"We do not adopt the limitation stated by counsel to the jurisdiction of the consular tribunal, that it extends only to offences committed on land. Neither the treaty nor the revised statutes to carry them into effect contain any such limitation. The latter speak of offences committed in the country of Japan—meaning within the territorial jurisdiction of that country—which includes its ports and navigable waters as well as its lands. The position that the petitioner, being a subject of Great Britain, was not within the jurisdiction of the consular court, is more plausible, but admits, we think, of a sufficient answer. The national character of the petitioner, for all the purposes of the consular jurisdiction, was determinable by his enlistment as one of the crew of the American ship Bullion. By such enlistment he becomes an American seaman—one of an American crew on board of an American vessel—and as such entitled to the protection and benefits of all the laws passed by congress on behalf of American seamen, and subject to all their obligations and liabilities. Although his relations to the British government are not so changed that, after the expiration of his enlistment on board of the American ship, that government may not enforce his obligation of allegiance, and he on the other hand may not be entitled to invoke its protection as a British subject, that relation was changed during his service of seaman on board of the American ship under his enlistment. He could then insist upon treatment as an American seaman, and invoke for his protection all the power of the United States which could be called into exercise for the protection of seamen who were native born. He owes for that time to the country to which the ship on which he is serving belongs, a temporary allegiance, and must be held to all its responsibilities. The question has been treated more as a political one for diplomatic adjustment, than as a legal one to be determined by the judicial tribunals, and has been the subject of correspondence between our government and that of Great Britain. The position taken by our government is expressed in a communication from the Secretary of State, to the British government, under date of June 16, 1881. It was the assertion of a principle which the Secretary insisted 'is in entire conformity with the principles of English law as applied to a mercantile service almost identical with our own in its organization and regulation. That principle is that, when a foreigner enters the mercantile marine of any nation and becomes one of the crew of a vessel having undoubtedly a national character, he assumes a temporary allegiance to the flag under which he serves, and in return for the protection afforded him becomes subject to the laws by which that nation in the exercise of an unquestioned authority governs its vessels and seamen. If, therefore,' he continued, 'the government of the United States has by treaty stipulation with Japan acquired the privilege of administering its own laws upon its own vessels and in relation to its own seamen in Japanese territory, then every American vessel and every seaman of its crew are sub-

ject to the jurisdiction which by such treaty has been transferred to the government of the United States.' If Ross had been a passenger on board of the Bullion, or, if, residing in Yokohama, he had come on board temporarily and had then committed the murder, the question of jurisdiction would have been very different. But, as it was, he was part of the crew, a duly enrolled seaman under American laws, enjoying the protection of this government to such an extent that he could have been protected from arrest by the British authorities; and his subjection to the laws of the United States cannot be avoided just at the moment that it suits his convenience to allege foreign citizenship. The law which he violated was the law made by the United States for the government of United States vessels; the person murdered was one of his own superior officers whom he had bound himself to respect and obey, and it is difficult to see by what authority the British government can assume the duty or claim the right to vindicate that law or protect that officer. The mercantile service is certainly a national service, although not quite in the sense in which that term would be applied to the national navy. It is an organized service, governed by a special and complex system of law, administered by national officers, such as collectors, harbor masters, shipping masters and consuls, appointed by national authority. This system of law attaches to the vessel and crew when they leave a national port and accompanies them around the globe regulating their lives, protecting their persons and punishing their offences. The sailor, like the soldier during his enlistment, knows no other allegiance than to the country under whose flag he serves. This law may be suspended while he is in the ports of a foreign nation, but where such foreign nation grants to the country which he serves the power to administer its own laws in such foreign territory, then the law under which he enlisted again becomes supreme. * * * We are satisfied that the true rule of construction in the present case was adopted by the Department of State in the correspondence with the English government, and that the action of the consular tribunal in taking jurisdiction of the prisoner Ross, though an English subject, for the offence committed, was authorized. While he was an enlisted seaman on the American vessel, which floated the American flag, he was, within the meaning of the statute and the treaty, an American, under the protection and subject to the laws of the United States equally with the seaman who was native born. As an American seaman he could have demanded a trial before the consular court as a matter of right, and must therefore be made subject to it as a matter of obligation."

I can discover nothing in the above quotation or in any other part of the opinion countenancing the idea that it was beyond the power of congress to prohibit under a penalty the prepayment on American soil or in American ports of the wages of seamen shipping in such ports on foreign vessels. Certainly if such prohibition were beyond the legislative authority in the case of foreign seamen, it would be equally so in the case of American seamen, for under the doctrine of temporary allegiance, so clearly enunciated by the supreme court, the same argument would apply with equal force to both cases. The court held that "the territorial jurisdiction" of a nation "includes its ports and navigable waters as well as its lands"; and that the "system of law" governing the mercantile service "attaches to the vessel and crew when they leave a national port and accompanies them round the globe, regulating their lives, protecting their persons and punishing their offences"; but recognized that "this law may be suspended while he is in the ports of a foreign nation, but where such foreign nation grants to the country which he serves the power to administer its own laws in such foreign territory, then the law under which he enlisted again becomes supreme." But the court did

not hold or state that the system of law which accompanies a vessel when it leaves a port of the country to which she belongs would, while she is in a port of a foreign nation, exclude the application of the law of that nation, passed for the protection of its shipping interests, declaring unlawful and providing punishment for acts done in the latter port by or on behalf of the master or agent of the vessel. If the prepayment of the libelant's wages had not been directly or indirectly made until after the Kestor left the port of Baltimore and was on the high seas, and then was not made on the soil or in the waters of the United States, the case would have presented a totally different aspect. But the prepayment was made in the port of Baltimore and consequently within the territorial jurisdiction of the United States. To hold that it was beyond the power of congress to apply the section to such a case would involve a clear departure from settled doctrine repeatedly recognized by the supreme court. In The Exchange v. McFaddon, 7 Cranch, 116, Chief Justice Marshall, delivering the opinion of the court, said:

"The jurisdiction of courts is a branch of that which is possessed by the nation as an independent sovereign power. The jurisdiction of the nation within its own territory is necessarily exclusive and absolute. It is susceptible of no limitation not imposed by itself. Any restriction upon it, deriving validity from an external source, would imply a diminution of its sovereignty to the extent of the restriction, and an investment of that sovereignty to the same extent in that power which could impose such restriction. All exceptions, therefore, to the full and complete power of a nation within its own territories, must be traced up to the consent of the nation itself. They can flow from no other legitimate source. * * * When private individuals of one nation spread themselves through another as business or caprice may direct, mingling indiscriminately with the inhabitants of that other, or when merchant vessels enter for the purposes of trade, it would be obviously inconvenient and dangerous to society, and would subject the laws to continual infraction, and the government to degradation, if such individuals or merchants did not owe temporary and local allegiance, and were not amenable to the jurisdiction of the country."

In U. S. v. Diekelman, 92 U. S. 520, 23 L. Ed. 742, Chief Justice Waite, delivering the opinion of the court, said:

"The merchant vessels of one country visiting the ports of another for the purposes of trade subject themselves to the laws which govern the port they visit, so long as they remain: and this as well in war as in peace, unless it is otherwise provided by treaty."

So in Wildenhus' Case, 120 U. S. 1, 7 Sup. Ct. 385, 30 L. Ed. 565, Chief Justice Waite, delivering the opinion of the court, said:

"It is part of the law of civilized nations that when a merchant vessel of one country enters the ports of another for the purposes of trade, it subjects itself to the law of the place to which it goes, unless by treaty or otherwise the two countries have come to some different understanding or agreement; for, as was said by Chief Justice Marshall in The Exchange, 7 Cranch, 116, 144, 3 L. Ed. 287, 296, 'it would be obviously inconvenient and dangerous to society and would subject the laws to continual infraction and the government to degradation, if such * * * merchants did not owe temporary and local allegiance, and were not amenable to the jurisdiction of the country.' * * * And the English judges have uniformly recognized the rights of the courts of the country of which the port is part to punish crimes committed by one foreigner on another in a foreign merchant ship. * * * As the owner has voluntarily taken his vessel for his own private purposes to a place within the

dominion of a government other than his own, and from which he seeks protection during his stay, he owes that government such allegiance for the time being as is due for the protection to which he becomes entitled."

Treaty stipulations between the United States and foreign nations are not restrictive of the constitutional power of congress. They have the force of law, but, like statutes, are superseded in American courts by subsequent acts of congress conflicting with them. Head Money Cases, 112 U. S. 580, 5 Sup. Ct. 247, 28 L. Ed. 798; Whitney v. Robertson, 124 U. S. 190, 8 Sup. Ct. 456, 31 L. Ed. 386; The Chinese Exclusion Case, 130 U. S. 581, 9 Sup. Ct. 623, 32 L. Ed. 1068; Horner v. U. S., 143 U. S. 570, 12 Sup. Ct. 522, 36 L. Ed. 266; Fong Yue Ting v. U. S., 149 U. S. 698, 13 Sup. Ct. 1016, 37 L. Ed. 905. It goes without saying that mere international comity not incorporated in any convention between the United States and a foreign power must yield to a statute with which it is in conflict. The section in question, it is true, contains the proviso that treaties in force between the United States and foreign countries do not conflict. There is, as before stated, no treaty between the United States and Great Britain inconsistent with the application of the section to British vessels. The proviso has reference to treaties, and not to international comity not embodied in a treaty. Full effect must, therefore, be given to the provision that "this section shall apply as well to foreign vessels as to vessels of the United States", as a constitutional enactment applying to the prepayment on our soil or in our waters of the wages of seamen who are British subjects shipping in American ports on British vessels.

It is not controverted that, if the section is constitutional and applicable to such a case, a libel may properly be filed in a court of admiralty for the recovery of the wages unlawfully prepaid. The section provides not only that such prepayment "shall be no defense to a libel, suit, or action for the recovery of such wages", but that it "shall in no case, excepting as herein provided, absolve the vessel or the master or owner thereof from full payment of wages after the same shall have been actually earned." To "absolve" the vessel evidently presupposes the existence of a lien thereon for wages enforcible, not by the resident consul of a foreign power, but by appropriate proceedings in a court of admiralty here or elsewhere. That this court has, and properly can entertain, jurisdiction of this case seems to me to be clear. In Ex parte Newman, 14 Wall. 152, 20 L. Ed. 877, Mr. Justice Clifford, in speaking of a libel for wages filed by foreigners against a foreign vessel of the same nationality, said:

"Admiralty courts, it is said, will not take jurisdiction in such a case except where it is manifestly necessary to do so to prevent a failure of justice, but the better opinion is that, independent of treaty stipulation, there is no constitutional or legal impediment to the exercise of jurisdiction in such a case. Such courts may, if they see fit, take jurisdiction in such a case, but they will not do so as a general rule without the consent of the representative of the country to which the vessel belongs, where it is practicable that the representative should be consulted. His consent, however, is not a condition of jurisdiction, but is regarded as a material fact to aid the court in determining the question of discretion, whether jurisdiction in the case ought or ought not to be exercised."

In The Belgenland, 114 U. S. 355, 5 Sup. Ct. 860, 29 L. Ed. 152, Mr. Justice Bradley, delivering the opinion of the court, said:

"Circumstances often exist which render it expedient for the court to take jurisdiction of controversies between foreigners in cases not arising in the country of the forum; as, where they are governed by the laws of the country to which the parties belong, and there is no difficulty in a resort to its courts; or where they have agreed to resort to no other tribunals. The cases of foreign seamen suing for wages, or because of ill-treatment, are often in this category; and the consent of their consul, or minister, is frequently required before the court will proceed to entertain jurisdiction; not on the ground that it has not jurisdiction; but that, from motives of convenience or international comity, it will use its discretion whether to exercise jurisdiction or not; and where the voyage is ended, or the seamen have been dismissed or treated with great cruelty, it will entertain jurisdiction even against the protest of the consul. * * * Of course, if any treaty stipulations exist between the United States and the country to which a foreign ship belongs, with regard to the right of the consul of that country to adjudge controversies arising between the master and crew, or other matters occurring on the ship exclusively subject to the foreign law, such stipulation should be fairly and faithfully observed. * * * In the absence of such treaty stipulations, however, the case of foreign seamen is undoubtedly a special one, when they sue for wages under a contract which is generally strict in its character, and framed according to the laws of the country to which the ship belongs; framed also with a view to secure, in accordance with those laws, the rights and interests of the ship-owners as well as those of master and crew, as well when the ship is abroad as when she is at home. Nor is this special character of the case entirely absent when foreign seamen sue the master of their ship for ill-treatment. On general principles of comity, admiralty courts of other countries will not interfere between the parties in such cases unless there is special reason for doing so, and will require the foreign consul to be notified, and, though not absolutely bound by, will always pay due respect to, his wishes as to taking jurisdiction. Not alone, however, in cases of complaints made by foreign seamen, but in other cases also, where the subjects of a particular nation invoke the aid of our tribunals to adjudicate between them and their fellow-subjects, as to matters of contract or tort solely affecting themselves and determinable by their own laws, such tribunals will exercise their discretion whether to take cognizance of such matters or not. * * * But, although the courts will use a discretion about assuming jurisdiction of controversies between foreigners in cases arising beyond the territorial jurisdiction of the country to which the courts belong, yet where such controversies are communis juris, that is, where they arise under the common law of nations, special grounds should appear to induce the court to deny its aid to a foreign suitor when it has jurisdiction of the ship or party charged. The existence of jurisdiction in all such cases is beyond dispute; the only question will be, whether it is expedient to exercise it."

In The Topsy (D. C.) 44 Fed. 631, the district court for the district of South Carolina, against the written request of the British consul, entertained jurisdiction of a libel for wages against a British vessel. Judge Simonton, after referring to the case of The Belgenland and other authorities, said:

"When, therefore, upon examination it appears that the construction and enforcement of the laws of a foreign state are involved in a question arising between parties owing allegiance to, and contracting with reference to, such laws, and that the tribunals of their own country are open and accessible to them, the court withholds its hand, remitting the parties to their own courts, in which their own laws are better understood, and the means of enforcing them possibly more complete. And this is especially observed in the matter of seamen's wages, the contract of which is local in its character, and is made the subject of special legislation in all maritime coun-

110 F.—29

tries. But when the circumstances of the case are such as demand immediate investigation, or when the seaman discharged from the ship would be put at disadvantage were she suffered to depart, or when she has departed he would be compelled to search the world for her, the court will proceed and decide the case against the wish and, at times, against the protest, of the foreign consul."

The controversy involved in this case is one "arising in the country of the forum". With respect to the unlawful act which has given birth to the controversy, the libelant and claimant are not "governed by the laws of the country to which the parties belong". Foreign subjects have not invoked the aid of this court "to adjudicate between them and their fellow-subjects, as to matters of contract or tort solely affecting themselves and determinable by their own laws". It is not a case "arising beyond the territorial jurisdiction of the country to which the courts belong". The parties have not "agreed to resort to no other tribunals" than British courts. The "construction and enforcement of the laws of a foreign state" are not here involved. The prepayment of wages was made in an American port in violation of a statute of the United States. The forbidden act was inoperative to deprive the libelant of the right to any portion of the wages to which he was entitled and which presumably, had it not been for that act, he would have received. In that respect it was an absolute nullity. He has filed his bill in an American court relying on an American statute designed to apply to his case and shield him from injustice. No question of the violation of British law arises in this connection. It does not appear that the British consul judicially or in any other manner determined the questions involved, nor has he protested against or objected to the exercise by this court of jurisdiction in the premises. No objection of the kind has been raised by the pleadings. The "voyage is ended", the libelant has been discharged, and the Kestor has proceeded elsewhere. His home is in Ontario. To decline jurisdiction would expose him to hardship and practically prevent him from recovering the wages to which he is entitled. Both reason and authority, under the circumstances, require that jurisdiction over the case should be exercised by this court. The sum of $36.18 which was offered to and refused by the libelant was not paid into court. The master paid it to the British consul in Philadelphia and it was forwarded to the London Board of Trade. The master so paid it at his peril, and any inconvenience which may attend its collection should not be visited on the libelant. I have grave doubt whether irrespective of the statute the stipulation in the shipping articles of "one shilling for the first twenty days" should, under the circumstances, be sustained by a court of admiralty against the libelant who is an illiterate seaman; but in view of the conclusion reached as to the effect of the statute, it is unnecessary to decide the point. The libelant is entitled to recover the balance of his wages without deducting the $20 wrongfully prepaid, namely, $56.18, with interest from the day of his discharge, November 19, 1899; the costs of the case to be paid by the claimant.

Let a decree be prepared accordingly.