### THE STATE OF MAINE. (Four Cases.)

*(District Court, S. D. New York. December 31, 1884.*

1. SEAMEN'S WAGES—ADVANCE WAGES—ACT OF JUNE 26, 1884.

   The act of June 26, 1884, forbidding advances of wages to seamen, is not applicable to the shipment of seamen in foreign ports.

2. SAME—MAKING ACTS OF SHIP-MASTERS IN FOREIGN JURISDICTION CRIMINAL.

   Though congress may possibly make acts done by American ship-masters within a foreign jurisdiction criminal, though legal by the laws of the port where the acts are committed, such an intention is not to be presumed from general language merely, which may be fully satisfied by its application within the jurisdiction of the United States, but should only be inferred from specific indications of an intention to include acts done in foreign territory.

3. SAME—CONSTRUCTION OF ACT OF CONGRESS.

   The general purposes of the above act, as well as some of its specific provisions and its necessary results, indicate a contrary purpose in this case.

4. SAME—VOUCHERS—WITNESSES DISCREDITED.

   A master in Antwerp, having unsuccessfully endeavored to procure necessary seamen without an advance of wages, subsequently shipped several seamen, agreeing through the consular office to pay their back board bills, on account of their wages, by their consent, and upon vouchers signed by them; and such bills were paid. Upon arrival at this port some of the seamen refused to allow the deductions under the above act, and libeled the vessel, and also denied their own vouchers. *Held,* their testimony being discredited, that the bills paid were valid offsets to their wages.

In Admiralty.

*Alexander & Ash*, for libelants.

*Henry D. Hotchkiss*, for claimant.

BROWN, J. In August, 1884, the American ship State of Maine, being at anchor at Antwerp, and in need of seamen there, shipped a crew, of whom the libelants were a part. Before doing so the captain in vain endeavored to procure a crew without making any advances of wages or paying any sailors' bills there. He was subsequently able to obtain a crew only upon providing for the payment of certain bills for board that were claimed to be due from the men there. The men were shipped under the supervision of the American consul at Antwerp, and the bills were paid by the captain through him. The correctness of these bills in each case was certified by the signatures of the seamen. Upon arrival at this port the crew left the ship, according to the master's statement, without being discharged, and before she was fairly made fast. In rendering his account to the shipping commissioner at this port the captain charged against the various members of the crew the amount of the bills that he had paid in their behalf, the vouchers for which were produced, signed by the men, as above stated. The majority of the crew accepted the balances due to them. Four of the libelants insisted on their full wages under the act of June 26, 1884, and in their testimony they deny that the bills were owed by them, and also deny their signatures to the vouchers.

The most important question presented is whether the act of June

26, 1884, known as the Dingley bill, applies to the shipment of seamen in foreign ports, as is claimed by the counsel for the libelants. Section 10 of that act provides—

"That it shall be, and is hereby, made unlawful, in any case, to pay any seaman wages before leaving the port at which such seaman may be engaged, in advance of the time when he has actually earned the same, or to pay such advance wages to any other person, or to pay any person, other than an officer authorized by act of congress to collect fees for such service, any remuneration for the shipment of seamen. Any person paying such advance wages, or such remuneration, shall be deemed guilty of a misdemeanor, and, upon conviction, shall be punished by a fine of not less than four times the amount of the wages so advanced or remuneration so paid, and may be also imprisoned for a period not exceeding six months, at the discretion of the court. The payment of such advance wages or remuneration shall in no case, except as herein provided, absolve the vessel, or the master or owner thereof, from full payment of wages after the same shall have been actually earned, and shall be no defense to a libel, suit, or action for the recovery of such wages: provided. that this section shall not apply to whaling vessels: and provided further, that it shall be lawful for any seaman to stipulate in his shipping agreement for an allotment of any portion of the wages which he may earn to his wife, mother, or other relative, but to no other person or corporation. And any person who shall falsely claim such relationship to any seaman, in order to obtain wages so allotted, shall, for every such offense, be punishable by a fine of not exceeding five hundred dollars, or imprisonment not exceeding six months, at the discretion of the court. This section shall apply as well to foreign vessels as to vessels of the United States, and any foreign vessel, the master, owner, consignee, or agent of which has violated this section, or induced or connived at its violation, shall be refused a clearance from any port of the United States."

The language of this section is doubtless broad enough to embrace the shipment of seamen in foreign ports, as well as in ports of the United States; but statutes must be interpreted and applied according to their intention. The act, it will be perceived, is penal, as well as remedial. Whatever the act prohibits may, if committed, be punished by six months' imprisonment. There seem to me to be controlling reasons why the shipment of seamen in foreign ports cannot be considered as within the intention, and hence not within the proper construction, of this act.

1. Statutes have no extraterritorial force. The shipment of seamen in a foreign port, and the payment either of advance wages or of bills previously incurred, as in this case, as an advance of wages, are acts done and completed wholly upon foreign soil; and therefore wholly beyond the jurisdiction of this country. If American vessels be treated as a part of the territory of the United States, and within its jurisdiction, though in foreign ports, still, acts like the present, that are not done upon shipboard, but, as I have said, are completed upon land prior to the seamen's coming aboard, and as a means of procuring them to do so, would not be done within the territorial jurisdiction of this country. Every presumption is against the supposition that congress had any intention to legislate in reference to acts done and completed wholly beyond its jurisdiction. And while congress might, perhaps,

subject the masters of American vessels, upon their return to this country, to punishment for acts done upon foreign soil, though such acts were lawful there, still, such an intention would not be presumed. Nor is such an intention sufficiently indicated by mere general language, that can be fully satisfied by its application to all such acts committed within the territorial jurisdiction of the United States. The intention to include acts done on foreign territory would only be inferred from some specific provisions, showing an indisputable intention to make the statute applicable to acts committed beyond our territorial jurisdiction. The provisions of this statute are not of that specific character.

2. The general purpose of this act is indicated by its title. Its various provisions, as well as the well-known circumstances which led to its passage, show that it was passed in order to correct certain practices and to reform certain abuses to which seamen were subject in the ports of this country. It is scarcely credible that in passing this act congress intended to undertake to correct similar evils in all parts of the world, if they everywhere exist. It had in view the reforms which were deemed necessary in our own ports, over which it had control; and there, presumably, its intention ends.

3. Having no power to carry out any such reforms in foreign territory, it is, again, scarcely credible that congress intended by this section to place American ships at a great disadvantage as compared with other ships in foreign ports, by preventing their obtaining seamen upon the same terms available to foreign vessels. This section, if applied to our vessels in foreign ports, would be wholly futile as regards the correction of any similar abuses there; and it would have no other practical effect than to cripple and disable our own shipping in foreign ports. This is a result clearly foreign to the purposes of this act. "All laws," say the supreme court in *U. S.* v. *Kirby,* 7 Wall. 486, "should receive a sensible construction. General terms should be so limited in their application as not to lead to injustice, oppression, or an absurd consequence. It will always, therefore, be presumed that the legislature intended exceptions to its language which would avoid results of this character. The reason of the law in such cases should prevail over its letter." *Carlisle* v. *U. S.* 16 Wall. 153.

4. The final clause of section 10, which declares that "this section shall apply as well to foreign vessels as to vessels of the United States," and that in case of violation a clearance shall be refused them, furnishes a specific indication that congress did not in this section refer to the shipment of seamen in foreign ports, but had in view acts done in this country alone. For it is manifest that, as against foreign vessels in foreign ports, not only would this whole section be mere *brutum fulmen*, but the specific provision just referred to would be wholly inapplicable. Its only possible legal application to foreign vessels would be as regards their acts while within the ports of this country. And as the intent of the section is clear to make no dis-

crimination between foreign vessels and domestic vessels, and as the section as to foreign vessels cannot possibly be applied as regards their acts done in foreign ports, it follows that the whole section must be deemed intended to apply to the ports of this country only.

For these reasons I must consider the act in question inapplicable to the present case. I am obliged to discredit the testimony of the seamen in this case, who deny their signatures to the vouchers and testify that they did not owe the debts stated. The handwriting of each is peculiar, and corresponds so entirely with their signatures to the depositions; and their testimony in regard to some other circumstances is discredited to such an extent, that I am obliged to consider their testimony as unworthy of belief. The circumstances of their attesting these bills, and the delivery of the vouchers to the consular agent, satisfy me that these bills were paid by their procurement and assent, and should stand charged against them. The seamen will be allowed, therefore, only the amounts due to them according to the master's account, deducting these advances. As these amounts were offered to them before suit and were refused, no costs will be allowed.