## THE IMBERHORNE.

(District Court, S. D. Alabama, S. D. February 13, 1917.)

### No. 1640.

1. SEAMEN ⬤⟿24—WAGES—PART PAYMENT AT INTERMEDIATE PORTS—FOREIGN VESSELS.

Seamen's Act March 4, 1915, c. 153, § 4, 38 Stat. 1165, amending Rev. St. § 4530, and providing for part payment of seamen's wages at intermediate ports, by its terms applies to seamen on foreign vessels while in ports of the United States, and, when invoked, must be enforced by the courts.

[Ed. Note.—For other cases, see Seamen, Cent. Dig. §§ 123–128.]

2. SEAMEN ⬤⟿23—SUIT TO RECOVER PART WAGES—CONSTRUCTION OF STATUTE.

Dingley Act June 26, 1884, c. 121, § 10, 23 Stat. 55 (Comp. St. 1913, § 8323), as amended by Seamen's Act March 4, 1915, c. 153, § 11, 38 Stat. 1168, makes it unlawful to pay any wages to a seaman in advance of their having been earned, and provides that "the payment of such advance wages * * * shall in no case except as herein provided absolve the vessel or the master or the owner thereof from the full payment of wages after the same shall have been actually earned, and shall be no defense to a libel suit or action for the recovery of such wages." It further provides that "this section shall apply as well to foreign vessels while in waters of the United States as to vessels of the United States." *Held* that, in a suit by seamen to recover one-half the wages earned on arrival in a port of the United States, under Rev. St. § 4530, as amended by section 4 of said Seamen's Act, the court cannot deduct from the wages earned the amount of advances made to them when they shipped, although they are aliens, serving on a foreign vessel, and the advances were made in a foreign country, where they were not unlawful.

[Ed. Note.—For other cases, see Seamen, Cent. Dig. §§ 118–122.]

In Admiralty. Suit by John Koskiner and others against the Russian ship Imberhorne. Decree for libelants.

Rickarby & Austill, of Mobile, Ala., for libelants.

Harry T. Pegues, of Mobile, Ala., for claimant.

ERVIN, District Judge. This is a libel filed by various seamen employed on the Russian ship Imberhorne, in which they claim under the provisions of section 4530 of the Revised Statutes, as amended by what is commonly called the "Seamen's Act," one-half of the wages that had been earned by said seamen up to the time the Imberhorne arrived at Mobile. The seamen were shipped at Grenock, Scotland, on or about December 1, 1916, and so had served about 55 days at the time when they reached Mobile. The proof shows that they then demanded of the master one-half of the wages that had been earned by them, and that the payment was refused by him, because he claims that he paid to each of these seamen one month's pay in advance, which, taken together with the subsequent payments made by the master to such seamen, amounts to more than one-half the total wages earned by such seamen up to the time of their demand on the captain.

The libelant contends that, under the provisions of section 10 (a) and

⬤⟿For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

10 (e) of the Seamen's Act, the deduction of advanced wages is prohibited. The master contends that the seamen have deserted, and under the provisions of section 4596 of the Revised Statutes, as amended by said Seamen's Act, that they have forfeited their wages.

The master and mate have been examined on behalf of the vessel, and the seamen have also been examined on their own behalf. Both the master and mate claim that the seamen have deserted, and that such desertion has been entered on the log of the ship. The seamen claim that they did not desert, but that they demanded one-half of the pay, which they claim they are entitled to, and that they have been ordered ashore by the master, and that they came ashore as a result of such order. The master denies ordering them ashore.

Upon a careful consideration of the evidence of the master, I am convinced that, while he has entered upon the log book the fact of the absence of the seamen for more than 24 hours, still he does not consider that these seamen have deserted; but he still considers that they have a right to return and continue under their original employment with the vessel. I find, therefore, that there has been no desertion on the part of these seamen.

There is another question presented in this case by the Russian consul, wherein he files a protest against this court's assuming jurisdiction of this question, because the terms of the treaty between Russia and the United States gives to the Russian consul exclusive right to hear such questions as this. I find, however, that the provisions of this treaty have been abrogated, and the terms of this act are in force as well against this vessel as against vessels of the United States. The Ixion (D. C.) 237 Fed. 142.

[1] The Supreme Court, in the case of Patterson v. Bark Eudora, 190 U. S. 169, 23 Sup. Ct. 821, 47 L. Ed. 1002, say:

"Yet when a foreign merchant vessel comes into our ports, like a foreign citizen coming into our territory, it subjects itself to the jurisdiction of this country. * * * It follows from these decisions that it is within the power of Congress to prescribe the penal provisions of section 10, and no one within the jurisdiction of the United States can escape liability for a violation of those provisions on the plea that he is a foreign citizen or an officer of a foreign merchant vessel. It also follows that it is a duty of the courts of the United States to give full force and effect to such provisions. It is not pretended that this government can control the action of foreign tribunals. In any case presented to them they will be guided by their own views of the law and its scope and effect, but the courts of the United States are bound to accept this legislation and enforce it whenever its provisions are violated. * * * And this legislation, as plainly as words can make it, imposes these conditions upon the shipment of sailors in our harbors, and declares that they are applicable to foreign as well as to domestic vessels. Congress has thus prescribed conditions which attend the entrance of foreign vessels into our ports, and those conditions the courts are not at liberty to dispense with."

It is true here the court was passing upon a shipment of seamen made within this country, but the language used certainly carries with it the idea that, regardless of whether the shipment may have been made here or elsewhere, when the vessel comes here it becomes immediately subject to our laws on this question. This must be necessarily true, because the same court (190 U. S. on page 173, 23 Sup. Ct. on page 822, 47 L. Ed. 1002) says:

"When, as here, the statute declares in plain words its intent in reference to a prepayment of seamen's wages, and follows that declaration with a further statement that the rule thus announced shall apply to foreign vessels as well as to vessels of the United States, it would do violence to language to say that it was not applicable to a foreign vessel."

That court follows this statement by holding that this enactment is not invalid because invasive of the liberty of contract guaranteed by our Constitution.

[2] This brings us to the main question in the case. In the case of The State of Maine (D. C.) 22 Fed. 733, Judge Brown, in construing the Dingley Bill (Act June 26, 1884, c. 121, 23 Stat. 53), holds that, where advances were made to the seamen in a foreign jurisdiction in order to induce them to sign, such advance is not included under the prohibitory clause of the act, and hence such advance on wages should be deducted from the one-half of the wages earned by the seamen. His opinion is strongly and clearly written, and I agree in the main with what he there says in holding that the penalties declared by this act cannot be imposed upon the master or the vessel for acts done in a foreign jurisdiction.

The Dingley Bill was amended by what is commonly called the "Seamen's Act," but the provisions of the Dingley Bill as to forbidding advances on seamen's wages do not seem to be changed by the amendment. The question in my mind is one that does not seem to have been considered by Judge Brown, and is whether the provisions of section 10 of the Dingley Act, as amended by the Seamen's Act, does not lay down a rule which a judge in this country is bound to follow in passing upon how one-half of the wages of a seaman is to be calculated. In other words, that even though the penalties declared by the act cannot be applied to or enforced against the vessel, still when we come to figure the one-half of the seaman's wages that have been earned, we are directed by the terms of the act to exclude any advances which may have been made by the ship to the seaman, whether made in a foreign jurisdiction or not, and we must follow this rule in calculating the wages of the seaman when a libel is filed in the admiralty courts of this country.

The act, in amending section 4530, says:

"Every seaman on a vessel of the United States shall be entitled to receive on demand from the master of the vessel to which he belongs one-half part of the wages which he shall have then earned at every port where such vessel, after the voyage has been commenced, shall load or deliver cargo before the voyage is ended and all stipulations in the contract to the contrary shall be void."

## Section 10 (a) of the Dingley Act, as amended, provides:

"That it shall be, and is hereby, made unlawful in any case to pay any seaman wages in advance of the time when he has actually earned the same, or to pay such advance wages, or to make any order, or note, or other evidence of indebtedness therefor to any other person, or to pay any person, for the shipment of seamen when payment is deducted or to be deducted from a seaman's wages. * * * The payment of such advance wages or allotment shall in no case except as herein provided absolve the vessel or the master or the owner thereof from the full payment of wages after the same shall have been actu-

ally earned, and shall be no defense to a libel suit or action for the recovery of such wages." (Italics mine.)

Section 10 (e), as amended, reads:

"That this section shall apply as well to foreign vessels while in waters of the United States, as to vessels of the United States."

In considering the question of whether or not the advance on the wages which has been made in a foreign jurisdiction should be excluded, I am struck in the first place with the statement contained in section 10 (a):

"The payment of such advance wages or allotment shall *in no case* except as herein provided *absolve the vessel* or the master or the owner thereof from *full payment of wages* after the same shall have been actually earned, and shall be *no defense to a libel* suit or action for the recovery of such wages."

Now, in the first place, here is a direct instruction to the court to reject the advance on the trial of this question, and the language seems to me to necessarily exclude the advance, because it says "in no case" is the advance to be allowed.

We are necessarily bound to concede that the act is to have some force, even though the shipping of the seaman and the advance on his wages was made in a foreign port, because the provision requiring the payment of the one-half of the wages earned by the seaman is before the court for enforcement, and this provision is to be enforced, notwithstanding the fact that the seaman was shipped in a foreign jurisdiction. If, then, some part of this act is applicable on this state of facts, then the question is how far the provisions of the act shall be applied. What provisions of the act are applicable, and what provisions are inapplicable, on this state of the facts? If we should say that, because the seamen were shipped in a foreign jurisdiction, none of the provisions of the act are applicable, we should have an entirely different question, because we would be controlled, not by the provisions of the act, but by the general maritime law; but the moment we concede that the seaman, under the provisions of this act, is entitled to the payment of one-half of the wages he *may have earned,* then it seems to me that we must also concede that the other provision of the act which rejects the advance on the wages must also be in force, no matter where such advances may have been made, and to my mind the provisions of section 10 (a) lay down the law which this court is bound to follow.

Again, it will be noticed that the advance to the seaman on his wages before the same have been earned is declared by the act to be unlawful. Certainly it cannot be contemplated that the courts of this country would enforce an agreement or transaction which Congress has declared to be unlawful here, even though such agreement or transaction was not unlawful where the same transpired. Such agreement or transaction would still be unlawful here. 2 Chitty on Contracts, 972 (11th American Edition).

In my opinion, when a libel is filed in the United States by a seaman seeking to recover one-half of the wages earned by him, and it

is shown that there has been paid to such seaman in a foreign port an advance on his wages, this court is bound by the provisions above quoted to reject the advance in ascertaining the one-half of the seaman's wages which may now be due him.

Tending to further support the construction which I have given to this act, it occurs to me, are the provisions of section 16 of the Seamen's Act, which provides:

"That in the judgment of Congress articles in treaties and conventions of the United States, in so far as they provide, * * *; and any other treaty provision in conflict with the provisions of this act, ought to be terminated, and to this end the President be, and he is hereby, requested and directed, within ninety days after the passage of this act, to give notice to the several governments, respectively, that so much as hereinbefore described of all such treaties and conventions between the United States and foreign governments will terminate on the expiration of such periods after notices have been given as may be required in such treaties and conventions."

Certainly, unless Congress intended these provisions to be applicable in the United States, it would not require the President to take steps to abrogate any treaty provisions which were in conflict with the provisions of the act.

I am, therefore, of the opinion that the libelants are entitled to recover, and a decree will be entered accordingly:

| | |
|---|---|
| A. Waltonen, the sum of | $ 29.02 |
| Artur Alto, the sum of | 27.84 |
| John Olson, the sum of | 24.68 |
| John Koskiner, the sum of | 22.44 |
| Adolf Mul, the sum of | 33.48 |
| Total | $137.46 |

—for which said amounts a decree will be entered against the said ship Imberhorne.