THE WINDRUSH.

THE RHINE.

(Circuit Court of Appeals, Second Circuit. February 14, 1918.)

Nos. 160, 161.

1. SEAMEN ⬦⥱23—WAGES—ADVANCE PAYMENT—CONSTRUCTION AND SCOPE OF
SEAMEN'S ACT.
   Act June 26, 1884, c. 121, § 10, 23 Stat. 55, as amended by Seamen's Act
March 4, 1915, c. 153, § 11, 38 Stat. 1168 (Comp. St. 1916, § 8323), making
it unlawful, under penalty, to pay any seaman wages in advance, and
providing that such payment shall not absolve the vessel from full pay-
ment of wages after they shall have been earned, does not apply to the
employment of seamen by American vessels in foreign ports; and when
in such case the master could not obtain seamen, except by paying a
month's wage in advance, in accordance with the custom of the port, which
was not there unlawful, and made such payment, the seamen are not
entitled to recover full wages, without deduction of such payment, at the
end of the voyage.

2. STATUTES ⬦⥱225¾—CONSTRUCTION—AMENDMENTS.
   In the construction of an amendment to an existing statute, the pre-
sumption is that the same words used therein have the meaning acquired
by prior judicial construction, and in doubtful cases contemporaneous and
departmental construction is entitled to weight.

   Learned Hand, District Judge, dissenting.

Appeal from the District Court of the United States for the Eastern
District of New York.

Suits in admiralty by John Hardy and others against the barken-
tine Windrush, the Shepard & Morse Lumber Company, claimant,
and by Paul Neilson and others against the sailing ship Rhine, the
Rhine Shipping Company, claimant. Decree for libelants in each case,
and claimants appeal. Reversed.

For opinion below, see 244 Fed. 833.

Both the craft named are vessels of the United States, within the meaning
of that phrase as used in the statutes affecting ships and seamen. In 1906
both were at Buenos Ayres, the Windrush in May and the Rhine in October;
both wanted crews, and neither could get one (as is stipulated in writing),
"except by agreeing to pay one month's wages in advance." This means, as is
fairly shown by evidence, that the keepers of sailors' boarding houses, com-
monly known as "crimps," have in that port such control of seamen that no
master can get a crew except by applying to them.

Both vessels got crews through a crimp; of the men shipped, some had
actually stayed with the boarding master, or obtained supplies from him, or
both; others had merely gone to him as a means of finding employment; all,
however, were treated alike, viz. taken before the United States consul, and
signed on the articles—each man giving to the boarding master an advance
note for one month's wage, the payment of which was duly noted. All the
men so shipped knew what they were doing, and apparently regarded it as
the custom of the port and a common incident of their trade; so undoubtedly
did the master; nor is there any evidence that the captain or owner profited,
directly or indirectly, by the transaction. They or their agents paid the ad-
vance notes before the ship left Buenos Ayres.

On arrival at New York, the libelants refused to recognize the charges or de-
ductions, and brought suit for a month's pay apiece, as for so much wages
wrongfully withheld. The court below awarded the amount claimed, and

⬦⥱For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

claimants took these appeals, which were argued together; the questions raised being identical.

Roscoe H. Hupper, of New York City, for appellants.
Silas B. Axtell, of New York City, for appellee.

Before WARD and HOUGH, Circuit Judges, and LEARNED HAND, District Judge.

HOUGH, Circuit Judge (after stating the facts as above). [1] The facts of these cases are in all material aspects those recited in The State of Maine (D. C.) 22 Fed. 734. Judge Addison Brown there gave judgment as to whether the then seamen's statute, commonly known as the Dingley Act (Act June 26, 1884, 23 Stat. 55), entitled libelants such as these to a recovery; the present question is whether (assuming the correctness of the decision cited) more recent legislation, commonly known as the La Follette Act (Act March 4, 1915, 38 Stat. 1168), requires a different ruling.

The material words of the statutes may be put in parallel thus (some immaterial phrases being omitted or shortened):

**1884**

It is hereby made unlawful to pay any seaman wages before leaving the port at which he may be engaged, in advance of the time when he has actually earned the same, or to pay such advance to any other person, or to pay any remuneration (to one not authorized by act of Congress) for shipment of seamen.

Any person paying advance wages, or such remuneration shall be deemed guilty of a misdemeanor, and punished by fine and (at option of the court) imprisonment.

The payment of such advance wages, or remuneration, shall in no case absolve the vessel from full payment of wages after they shall have been earned, and be no defense to a libel for recovery of wages.

This section shall apply as well to foreign vessels as to vessels of the United States, and any foreign vessel violating the same shall be refused a clearance.

**1915**

It is hereby made unlawful to pay any seaman wages in advance of the time when he has actually earned the same, or to make any order or note therefor to any other person or to pay any person for the shipment of seamen when payment is deducted or to be deducted from a seaman's wages.

Any person violating the foregoing shall be deemed guilty of a misdemeanor and punished by fine, and (at option of the court) imprisonment.

The payment of such advance wages or allotment shall in no case absolve the vessel from full payment of wages after they shall have been earned and shall be no defense to a libel for recovery of wages.

If any person shall receive from any seaman any remuneration for providing him with employment, such person shall be deemed guilty of a misdemeanor and punished with fine or imprisonment.

This section shall apply as well to foreign vessels, while in waters of the United States, as to vessels of the United States, and any foreign vessel violating the same shall be refused a clearance.

The master, etc., of any vessel (domestic or foreign) seeking clearance from a port of the United States shall present his shipping articles at the office of clearance, and none shall be granted unless the provisions of this article have been complied with.

The Case of The State of Maine held that this portion of the statute of 1884 had no application to the employment of seamen by American

vessels in foreign ports. That it was well decided we have no doubt, agreeing as we do with the reasons assigned, and considering the intellectual authority of a decision by that judge of the highest. The State Department, which, through the consuls, is charged with oversight of shipment of seamen abroad, accepted the ruling, and embodied it (with due reference to the decision) in the Consular Regulations (section 237); nor did the passage of the act of 1915 produce any change in departmental instructions. What governed the action of the consul at Buenos Ayres, when these libelants were shipped, was the rule of The State of Maine.

The only other interpretation of the Dingley Act thought instructive here is The Eudora, 190 U. S. 169, 23 Sup. Ct. 821, 47 L. Ed. 1002, holding the statute applicable to foreign vessels in American ports, mainly on reasoning more elaborately set forth in Wildenhus' Case, 120 U. S. 1, 7 Sup. Ct. 385, 30 L. Ed. 565; i. e., that any vessel and those on board her are subject to the civil and criminal law of the country into whose ports they come. Such subjection is one of the implied conditions of entry, which is a favor, and not a right. Unless there has been a change in the legal content of the statute, its interpretation must remain unchanged. So far as the language above given is concerned, there is but one change that can be relied on; i. e., that the application of the act to foreign vessels is expressly limited to waters of the United States, from which it is argued that the application to domestic vessels must be universal.

Of this it may be said that by the same train of reasoning some significance must be given to the section regarding clearances, in respect of which, for domestic ships, the act of 1884 said nothing. Must it then follow that prior to 1915 vessels of the United States violating the statute were necessarily entitled to clearance? Such a contention could not be made. Indeed, the argument for libelants proceeds mainly and frankly on the ground that the act of 1915 is in its entirety so obviously remedial that by it the status of seamen has been so radically changed, and the rigidity of their engagements so greatly relaxed, that it must have been intended to make the statute extraterritorially operative, and uplift sailors by putting on their employers the cost of a rascally way of doing business, over which this country has no direct jurisdiction.

Undoubtedly the methods of shipment exhibited in this record are vile, and it may be admitted as within legislative power to improve the social customs of a contract breaker, by encouraging the act of breach; but we are bound by what Congress did, as expressed in the words employed, having recourse for that purpose to "the whole context of the statute" (Johnson v. Southern Pacific Co., 196 U. S. 1, 25 Sup. Ct. 158, 49 L. Ed. 363), and this is true, even when the law is both remedial and penal, but with the "design to give relief more dominant than to inflict punishment."

We find no words in the entire act rendering the particular kind of relief here sought, certainly within the legislative intent or meaning. We have not before us any reports of congressional committees, which, however, may be consulted only to ascertain motive. McLean v. Unit-

ed States, 226 U. S. 374, 33 Sup. Ct. 122, 57 L. Ed. 260. There are, however, some rules of law which the Legislature must have intended by the words of this act to overset, if the libelants are entitled to a decree.

[2] This is an amendment to existing law, and the presumption is that the same words used therein have the meaning acquired by prior judicial construction. United States v. Trans-Missouri Ass'n, 58 Fed. 67, 7 C. C. A. 15, 24 L. R. A. 73. In every doubtful case, contemporaneous (Houghton v. Payne, 194 U. S. 88, 24 Sup. Ct. 590, 48 L. Ed. 888) and departmental (United States v. Cerecedo, etc., Co., 209 U. S. 337, 28 Sup. Ct. 532, 52 L. Ed. 821) construction is entitled to weight, when the words of a statute get before a court. That the present act is remedial is admitted; so was that of 1884; but both are also plainly penal. That remedies of the kind here demanded by libelants are more in favor now than in 1884 is true enough; but words have not necessarily changed their ordinary meaning, and the rules of statutory construction remain unaltered. The remedial and penal portions of the part of the statute under consideration cannot be separated; if what these shipmasters did in Buenos Ayres was not lawful, it was unlawful, and a misdemeanor was committed. If it be possible now and in this country to enact a law making a crime of something done by an American citizen in a foreign land (Rex v. Sawyer, 1 C. & K. 101), every and the strongest presumption is against such construction (American, etc., Co. v. United Fruit Co., 213 U. S. 347, 29 Sup. Ct. 511, 53 L. Ed. 826, 16 Ann. Cas. 1047).

The absurdity of considering the ship captains indictable is not denied; therefore the contention becomes this: That this executed contract must be set aside, because the statute in effect declares it repugnant to the "policy and morality" of the people of the United States. We discover no consensus on this point of morals in the written law, there is no evidence on the subject, and the rule appealed to ordinarily affects only executory contracts. The situation here is this: Libelants demand a part of their wages in accordance with the law of the United States; respondents answer, We paid you that part in Argentine in accordance with the law of that country; libelants reply, The law of the United States refuses to recognize that lawful and completed transaction. For so extreme a doctrine support can be found only in plain, unquestioned legislative order; and such order cannot be discovered in this statute.

In The Eudora and The State of Maine, supra, a subsidiary reason for the harmonious construction there given to the act of 1884 was that the announced rulings put foreign and domestic vessels on the same footing. That doctrine also was presumptively before Congress in passing the later statute. The ruling made below gives foreign vessels an advantage, certainly if (e. g.) the voyage is from one foreign port to another. No intent to do this is perceivable in the act.

We have not overlooked The Imberhorne (D. C.) 240 Fed. 830, and The Talus (D. C.) 242 Fed. 954. In so far as they do not harmonize with the foregoing, we differ.

Decree reversed, and causes remanded, with directions to dismiss the libels.

LEARNED HAND, District Judge (dissenting). If section 10 (a) had not been amended in the clause here in question, I should have felt bound by the construction which Judge Brown had put upon it in The State of Maine (D. C.) 22 Fed. 734, under the well-settled rule that a prior accepted interpretation of the statute is incorporated into its re-enactment. Moreover, I think that Judge Brown's decision was certainly right at the time he made it. His fourth reason for excluding American ships from the operation of the statute while in foreign ports seems to me to be unanswerable. The statute did not discriminate, as he says, between foreign vessels and those of the United States, and it was necessary to give the general language of the statute the same application to one class as to the other.

Under that statute, not only did Judge Brown hold that vessels of the United States were controlled only while here, but the Supreme Court, in Patterson v. Bark Eudora, 190 U. S. 169, 23 Sup. Ct. 821, 47 L. Ed. 1002, held that foreign vessels were bound, and obviously only while here. There was, therefore, not the slightest reason, when amending the statute, to add the clause, "while in waters of the United States," in order to provide the necessary limitation. Furthermore, I attach significance to the direct conjunction of the limiting clause with the phrase "foreign vessels." If the statute had read "as well to foreign vessels as to vessels of the United States while in the waters of the United States," there could have been no doubt; but the limitation by its position directly affecting one class seems to me to give the other its general meaning, unless there was good contrary reason in the context.

I can see no reason in the context for such a limitation. Of course it results in some extraterritorial operation of the statutes, but only as regards vessels of the United States, and we are used enough to statutes which assume to do that. It would not strain the interpretation of a statute to make it apply to any act done on board ship. It is true, these acts were done ashore; but they were to engage crews who should perform all their services in a United States ship—they were a condition upon those services, and touched them as closely as possible. When performed by an American master, at least, not to consider an owner, no valid distinction in the purpose of the statute seems to me to be found in the locus of the act. The penalties against "crimps" in foreign countries stand upon a different footing; they are not associated with United States vessels and subject normally to the laws of the United States.

Again, it is said that the provision making compliance with the statute a condition on clearances shows an intention to limit its application. Yet this touches only the remedy, and it would be a hard rule which limited the substance, because the remedy could not in the nature of things be coextensive with its general application. No inference seems to me justified from such a consideration.

Finally, the claimant insists that it puts United States vessels at a disadvantage in foreign ports. In such countries as do not protect their seamen against this form of exploitation, this is doubtless true; but the provision itself presupposes that the seamen are at an economic disadvantage. The initiative in all such efforts to impose a standard

of wages bears at first against local industry. If it is not undertaken, all remedies must wait till other nations join. Granted the supposed injustice of the practice, the ships or the men must therefore suffer till the evils of the practice get general recognition. The incidental burden on trade may conceivably not have been thought of equal moment with the putative welfare of the crews. In any case it seems to me that such considerations are beyond the proper cognizance of courts of law. Surely we have no right to assume that the interest of the state depends more upon the welfare of one of these conflicting economic classes than the other.

I dissent.