## PATTERSON *v.* BARK EUDORA.

CERTIFICATE FROM THE CIRCUIT COURT OF APPEALS FOR THE THIRD CIRCUIT.

No. 278.   Argued May 1, 1903.—Decided June 1, 1903.

The title is no part of a statute.   Where a statute declares that it shall apply to foreign vessels as well as vessels of the United States, the fact that its title states that it relates to American seamen cannot be used to set at naught the obvious meaning of the statute itself.

Contracts for seamen's wages are exceptional in character and may be subjected to special restrictions, and whenever they relate to commerce not wholly within a State, legislation enforcing such restrictions comes

within the domain of Congress under the commerce clause of the Constitution, and such legislation is not contrary to the Fourteenth or Thirteenth Amendment.

When Congress prescribes such restrictions, no one within the jurisdiction of the United States can escape liability for a violation thereof on a plea that he is a foreign citizen or an officer of a foreign merchant vessel. The implied consent of this government to leave jurisdiction over the internal affairs of foreign merchant vessels in our harbors to the nations to which such vessels belong respectively may be withdrawn, and it is within the power of Congress to protect all sailors shipping within our ports on vessels engaged in foreign or interstate commerce, whether foreign or belonging to citizens of this country.

Under the act of Congress of December 21, 1898, prohibiting the payment of seamen's wages in advance, seamen shipped on a foreign vessel from an American port to a foreign port and return to an American port who have received a part of their wages in advance may, after the completion of the voyage, recover by libel filed against the vessel the full amount of their wages including the advance payments, although such payments are not due either under the terms of the contract or under the law of the country to which the vessel belongs.

On December 21, 1898, 30 Stat. 755, 763, Congress passed an act entitled " An act to amend the laws relating to American seamen, for the protection of such seamen and to promote commerce." The material portion thereof is found in section 24, which amends section 10 of chapter 121 of the laws of 1884, so as to read :

" SEC. 10. (a) That it shall be, and is hereby, made unlawful in any case to pay any seaman wages in advance of the time when he has actually earned the same, or to pay such advance wages to any other person. Any person paying such advance wages shall be deemed guilty of a misdemeanor, and upon conviction shall be punished by a fine not less than four times the amount of the wages so advanced, and may also be imprisoned for a period not exceeding six months, at the discretion of the court. The payment of such advance wages shall in no case, excepting as herein provided, absolve the vessel or the master or owner thereof from full payment of wages after the same shall have been actually earned, and shall be no defense to a libel, suit, or action for the recovery of such wages. If any person shall demand or receive, either directly

or indirectly, from any seaman or other person seeking employ-
ment as seaman, or from any person on his behalf, any re-
muneration whatever for providing him with employment, he
shall for every such offence be liable to a penalty of not more
than one hundred dollars."

"(*f*) That this section shall apply as well to foreign vessels
as to vessels of the United States; and any master, owner,
consignee, or agent of any foreign vessel who has violated its
provisions shall be liable to the same penalty that the master,
owner, or agent of a vessel of the United States would be for a
similar violation: *Provided,* That treaties in force between the
United States and foreign nations do not conflict."

The appellants were seamen on board the British bark Eudora,
and filed this libel for wages in the District Court of the United
States for the Eastern District of Pennsylvania. By an agreed
statement of facts it appears that on January 22, 1900, they
shipped on board such bark to serve as seamen for and during
a voyage from Portland, Maine, to Rio and other points, not
to exceed twelve months, the final port of discharge to be in
the United States or Canada, with pay at the rate of one shil-
ling for forty-five days and twenty dollars per month thereafter.
At the time of shipment twenty dollars was paid on account
of each of them, and with their consent, to the shipping agent
through whom they were employed. On the completion of
the voyage they, having performed their duties as seamen,
demanded wages for the full term of service, ignoring the pay-
ment made at their instance to the shipping agent. The ad-
vanced payment and contract of shipment were not contrary to
or prohibited by the laws of Great Britain. It was contended,
however, that they were prohibited by the act of Congress,
above quoted, and that such act was applicable. The District
Court entered a decree dismissing the libel. 110 Fed. Rep.
430. On appeal to the Circuit Court of Appeals for the Third
Circuit that court certified the following questions to this
court:

"First. Is the act of Congress of December 21, 1898, prop-
erly applicable to the contract in this case?

"Second. Under the agreed statement of facts above set

forth, upon a libel filed by said seamen, after the completion of the voyage, against the British vessel, to recover wages which were not due to them under the terms of their contract or under the law of Great Britain, were the libellants entitled to a decree against the vessel?"

*Mr. Joseph Hill Brinton* for appellants.

*Mr. Horace L. Cheyney* for appellee. *Mr. John F. Lewis* was on the brief.

On motion of *Mr. Solicitor General Hoyt* a brief on which was *Mr. Assistant Attorney General Beck* was filed on behalf of the United States.

MR. JUSTICE BREWER, after making the foregoing statement, delivered the opinion of the court.

Applying the ordinary rules of construction, it does not seem to us doubtful that the act of Congress, if within its power, is applicable in this case. The act makes it unlawful to pay any seaman wages in advance, makes such payment a misdemeanor, and in terms provides that such payment shall not absolve the vessel or its master or owner for full payment of wages after the same shall have been actually earned. And further, it declares that the section making these provisions shall apply as well to foreign vessels as to vessels of the United States, provided that treaties in force between the United States and foreign nations do not conflict. It is true that the title of the act of 1898 is "An act to amend the laws relating to American seamen," but it has been held that the title is no part of a statute, and cannot be used to set at naught its obvious meaning. The extent to which it can be used is thus stated by Chief Justice Marshall in *United States* v. *Fisher*, 2 Cranch, 358, 386:

"Neither party contends, that the title of an act can control plain words in the body of the statute; and neither denies that, taken with other parts, it may assist in removing ambiguities. Where the intent is plain, nothing is left to con-

struction. Where the mind labors to discover the design of the legislature, it seizes everything from which aid can be derived; and in such case, the title claims a degree of notice, and will have its due share of consideration."

See also *Yazoo Railroad* v. *Thomas*, 132 U. S. 174, 188; *United States* v. *Oregon &c. Railroad*, 164 U. S. 526, 541; *Price* v. *Forrest*, 173 U. S. 410, 427; Endlich on Interpretation of Statutes, secs. 58, 59. When, as here, the statute declares in plain words its intent in reference to a prepayment of seamen's wages, and follows that declaration with a further statement that the rule thus announced shall apply to foreign vessels as well as to vessels of the United States, it would do violence to language to say that it was not applicable to a foreign vessel.

But the main contention is that the statute is beyond the power of Congress to enact, especially as applicable to foreign vessels. It is urged that it invades the liberty of contract which is guaranteed by the Fourteenth Amendment to the Federal Constitution, and reference is made to *Allgeyer* v. *Louisiana*, 165 U. S. 578, 589, in which we said:

"The liberty mentioned in that amendment means not only the right of the citizen to be free from the mere physical restraint of his person, as by incarceration, but the term is deemed to embrace the right of the citizen to be free in the enjoyment of all his faculties; to be free to use them in all lawful ways; to live and work where he will; to earn his livelihood by any lawful calling; to pursue any livelihood or avocation, and for that purpose to enter into all contracts which may be proper, necessary and essential to his carrying out to a successful conclusion the purposes above mentioned."

Further, that even if the contract be one subject to restraint under the police power, that power is vested in the States and not in the general government, and any restraint, if exercised at all, can only be exercised by the State in which the contract is entered into; that the only jurisdiction possessed by Congress in respect to such matters is by virtue of its power to regulate commerce, interstate and foreign; that the regulation of commerce does not carry with it the power of controlling contracts

of employment by those engaged in such service, any more than it includes the power to regulate contracts for service on interstate railroads, or for the manufacture of goods which may be intended for interstate or foreign commerce; and, finally, that the validity of a contract is to be determined by the law of the place of performance, and not by that of the place of the contract; that the contract in this case was one entered into in the United States, to be performed on board a British vessel, which is undoubtedly British territory, and therefore its validity is to be determined by British law, and that, as conceded in the question, sustains its validity.

We are unable to yield our assent to this contention. That there is, generally speaking, a liberty of contract which is protected by the Fourteenth Amendment, may be conceded, yet such liberty does not extend to all contracts. As said in *Frisbie* v. *United States*, 157 U. S. 160, 165:

"While it may be conceded that, generally speaking, among the inalienable rights of the citizen is that of the liberty of contract, yet such liberty is not absolute and universal. It is within the undoubted power of government to restrain some individuals from all contracts, as well as all individuals from some contracts. It may deny to all the right to contract for the purchase or sale of lottery tickets; to the minor the right to assume any obligations, except, for the necessaries of existence; to the common carrier the power to make any contract releasing himself from negligence, and, indeed, may restrain all engaged in any employment from any contract in the course of that employment which is against public policy. The possession of this power by government in no manner conflicts with the proposition that, generally speaking, every citizen has a right freely to contract for the price of his labor, services, or property."

And that the contract of a sailor for his services is subject to some restrictions was settled in *Robertson* v. *Baldwin*, 165 U. S. 275, in which sections 4598 and 4599, Rev. Stat., in so far as they require seamen to carry out the contracts contained in their shipping articles, were held not to be in conflict with the Thirteenth Amendment, and in which a deprivation of personal

liberty not warranted in respect to other employés was sustained as to sailors. We quote the following from the opinion (p. 282):

" From the earliest historical period the contract of the sailor has been treated as an exceptional one, and involving, to a certain extent, the surrender of his personal liberty during the life of the contract. Indeed, the business of navigation could scarcely be carried on without some guaranty, beyond the ordinary civil remedies upon contract, that the sailor will not desert the ship at a critical moment, or leave her at some place where seamen are impossible to be obtained—as Molloy forcibly expresses it, ' to rot in her neglected brine.' Such desertion might involve a long delay of the vessel while the master is seeking another crew, an abandonment of the voyage, and, in some cases, the safety of the ship itself. Hence, the laws of nearly all maritime nations have made provision for securing the personal attendance of the crew on board, and for their criminal punishment for desertion, or absence without leave during the life of the shipping articles."

If the necessities of the public justify the enforcement of a sailor's contract by exceptional means, justice requires that the rights of the sailor be in like manner protected. The story of the wrongs done to sailors in the larger ports, not merely of this nation but of the world, is an oft-told tale, and many have been the efforts to protect them against such wrongs. One of the most common means of doing these wrongs is the advancement of wages. Bad men lure them into haunts of vice, advance a little money to continue their dissipation, and, having thus acquired a partial control and by liquor dulled their faculties, place them on board the vessel just ready to sail and most ready to return the advances. When once on shipboard and the ship at sea the sailor is powerless and no relief is availing. It was in order to stop this evil, to protect the sailor, and not to restrict him of his liberty, that this statute was passed. And while in some cases it may operate harshly, no one can doubt that the best interests of seamen as a class are preserved by such legislation.

Neither do we think there is in it any trespass on the rights

of the States. No question is before us as to the applicability of the statute to contracts of sailors for services wholly within the State. We need not determine whether one who contracts to serve on a steamboat between New York and Albany, or between any two places within the limits of a State, can avail himself of the privileges of this legislation, for the services contracted for in this case were to be performed beyond the limits of any single State and in an ocean voyage. Contracts with sailors for their services are, as we have seen, exceptional in their character, and may be subjected to special restrictions for the purpose of securing the full and safe carrying on of commerce on the water. Being so subject, whenever the contract is for employment in commerce, not wholly within the State, legislation enforcing such restrictions comes within the domain of Congress, which is charged with the duty of protecting foreign and interstate commerce.

Finally, while it has often been stated that the law of the place of performance determines the validity of a contract, *London Assurance* v. *Companhia de Moagens*, 167 U. S. 149, 160, yet that doctrine does not control this case. It may be remarked in passing that it does not appear that the contract of shipment or the advance payment were made on board the vessel. On the contrary, the stipulated fact is that the "seamen were engaged in the presence of the British vice consul at the port of New York." The wrongful acts were, therefore, done on the territory and within the jurisdiction of the United States. It is undoubtedly true that for some purposes a foreign ship is to be treated as foreign territory. As said by Mr. Justice Blackburn, in *Queen* v. *Anderson*, L. R. 1 Crown Cases Reserved, 161, "A ship, which bears a nation's flag, is to be treated as a part of the territory of that nation. A ship is a kind of floating island." Yet when a foreign merchant vessel comes into our ports, like a foreign citizen coming into our territory, it subjects itself to the jurisdiction of this country. In *Schooner Exchange* v. *McFadden*, 7 Cranch, 116, 136, 146, this court held that a public armed vessel in the service of a sovereign at peace with the United States is not within the ordinary jurisdiction of our tribunals while within a port of the United

States. In the opinion by Chief Justice Marshall, it was said that " the jurisdiction of the nation within its own territory is necessarily exclusive and absolute; it is susceptible of no limitation not imposed by itself. Any restriction upon it, deriving validity from an external source, would imply a diminution of its sovereignty to the extent of the restriction, and an investment of that sovereignty to the same extent in that power which could impose such restriction. All exceptions, therefore, to the full and complete power of a nation within its own territories must be traced up to the consent of the nation itself. They can flow from no other legitimate source. This consent may be either express or implied. In the latter case, it is less determinate, exposed more to the uncertainties of construction; but, if understood, not less obligatory." And, again, after holding it " to be a principle of public law, that national ships of war, entering the port of a friendly power open for their reception, are to be considered as exempted by the consent of that power from its jurisdiction," he added: "Without doubt, the sovereign of the place is capable of destroying this implication. He may claim and exercise jurisdiction, either by employing force, or by subjecting such vessels to the ordinary tribunals."

Again, in *Wildenhus's Case,* 120 U. S. 1, in which the jurisdiction of a state court over one charged with murder, committed on board a foreign merchant vessel in a harbor of the State, was sustained, it was said by Mr. Chief Justice Waite (pp. 11, 12):

"It is part of the law of civilized nations that when a merchant vessel of one country enters the ports of another for the purposes of trade, it subjects itself to the law of the place to which it goes, unless by treaty or otherwise the two countries have come to some different understanding or agreement. . . . From experience, however, it was found long ago that it would be beneficial to commerce if the local government would abstain from interfering with the internal discipline of the ship, and the general regulation of the rights and duties of the officers and crew towards the vessel or among themselves. And so by comity it came to be generally understood among civilized na-

tions that all matters of discipline and all things done on board which affected only the vessel or those belonging to her, and did not involve the peace or dignity of the country, or the tranquillity of the port, should be left by the local government to be dealt with by the authorities of the nation to which the vessel belonged as the laws of that nation or the interests of its commerce should require. But if crimes are committed on board of a character to disturb the peace and tranquillity of the country to which the vessel has been brought, the offenders have never by comity or usage been entitled to any exemption from the operation of the local laws for their punishment, if the local tribunals see fit to assert their authority."

It follows from these decisions that it is within the power of Congress to prescribe the penal provisions of section 10, and no one within the jurisdiction of the United States can escape liability for a violation of those provisions on the plea that he is a foreign citizen or an officer of a foreign merchant vessel. It also follows that it is a duty of the courts of the United States to give full force and effect to such provisions. It is not pretended that this government can control the action of foreign tribunals. In any case presented to them they will be guided by their own views of the law and its scope and effect, but the courts of the United States are bound to accept this legislation and enforce it whenever its provisions are violated. The implied consent of this government to leave jurisdiction over the internal affairs of foreign merchant vessels in our harbors to the nations to which those vessels belong may be withdrawn. Indeed, the implied consent to permit them to enter our harbors may be withdrawn, and if this implied consent may be wholly withdrawn it may be extended upon such terms and conditions as the government sees fit to impose. And this legislation, as plainly as words can make it, imposes these conditions upon the shipment of sailors in our harbors, and declares that they are applicable to foreign as well as to domestic vessels. Congress has thus prescribed conditions which attend the entrance of foreign vessels into our ports, and those conditions the courts are not at liberty to dispense with. The interests of our own shipping require this. It is well said by

counsel for the government in the brief which he was given leave to file:

"Moreover, as ninety per cent of all commerce in our ports is conducted in foreign vessels, it must be obvious that their exemption from these shipping laws will go far to embarrass domestic vessels in obtaining their quota of seamen. To the average sailor it is a consideration while in port to have his wages in part prepaid, and if in a large port like New York ninety per cent of the vessels are permitted to prepay such seamen as ship upon them, and the other ten per cent, being American vessels, cannot thus prepay, it will be exceedingly difficult for American vessels to obtain crews. This practical consideration, presumably, appealed to Congress and fully justified the provision herein contained."

We are of the opinion that it is within the power of Congress to protect all sailors shipping in our ports on vessels engaged in foreign or interstate commerce, whether they belong to citizens of this country or of a foreign nation, and that our courts are bound to enforce those provisions in respect to foreign equally with domestic vessels.

*The questions, therefore, certified by the Court of Appeals will each be answered in the affirmative.*

MR. JUSTICE HARLAN concurred in the judgment.