## ANDERSEN v. SHIPOWNERS' ASS'N OF THE PACIFIC COAST et al.

Circuit Court of Appeals, Ninth Circuit.
March 18, 1929.

No. 5576.

H. W. Hutton, of San Francisco, Cal., for appellant.

Herman Phleger, Maurice E. Harrison, and George O. Bahrs, all of San Francisco, Cal., for appellees.

Before GILBERT and DIETRICH, Circuit Judges, and NORCROSS, District Judge.

NORCROSS, District Judge. From a judgment for defendants upon trial, complainant appeals.

The bill of complaint, charging defendants with being a combination in restraint of interstate and foreign commerce, was originally dismissed by the District Court as not stating a cause of action, and upon appeal to this court was affirmed. Anderson v. Shipowners' Ass'n (C. C. A.) 10 F.(2d) 96. Upon a writ of certiorari to the Supreme Court of the United States, the decree of dismissal was reversed. Anderson v. Shipowners' Ass'n, 272 U. S. 359, 47 S. Ct. 125, 71 L. Ed. 298.

In the opinion of the Supreme Court, cited supra, the allegations of the complaint are set out quite fully, and that court concludes: "Taking the allegations of the bill at their face value, as we must do in the absence of countervailing facts or explanations, it appears that each shipowner and operator in this widespread combination has surrendered his freedom of action in the matter of employing seamen and agreed to abide by the will of the associations. Such is the fair interpretation of the combination and of the various requirements under it, and this is borne out by the actual experience of the petitioner in his efforts to secure employment. These shipowners and operators having thus put themselves into a situation of restraint upon their freedom to carry on interstate and foreign commerce according to their own choice and discretion, it follows, as the case now stands, that the combination is in violation of the Anti-Trust Act [15 USCA § 1]."

Upon the coming down of the mandate from the Supreme Court, the defendants filed their answer and a supplemental answer, denying the material allegations of the bill. After a review of the testimony submitted, the court below in an opinion filed held "that plaintiff has not sustained his burden of proof as to the allegations of his complaint." Anderson v. Shipowners' Ass'n (D. C.) 27 F.(2d) 163.

The case is one local in character. The defendant Shipowners' Association is an organization principally of shipowners operating in the coastwise trade. The defendant Pacific American Association is an organization principally comprising shipowners engaged in intercoastal and foreign trade. Jointly they maintain at San Francisco and San Pedro, in the state of California, employment bureaus called Marine Service Bureau, through which seamen may be employed. Primarily the suit is one to enjoin defendants, their members and agents, from maintaining a combination in restraint of commerce.

The method of conducting the Marine Service Bureau was described by Capt. Peterson, in charge of the San Francisco office, as follows:

"When an applicant presents himself in either of said offices, he is asked to give his name and other information which might be of value to prospective employers in order that the latter may be better able to determine whether or not they wish to employ the applicant. A card is then made out substantially in the form shown in paragraph VII of the original answer on file herein.

| San Francisco | |
|---|---|
| Mr. ..................... | Application |
| Is recorded in the Deck | ........................., |
| Department as............ | Service Record |
| Serial Number | |
| ................. | ........................... |
| Marine Service Bureau | Status of |
| 330 Battery Street | Citizenship |
| Date ...................... | |
| ......................... | |

"The applicant holds this card until he secures employment and remains at said office until such time as he is engaged by the operator of a vessel when the operator of a vessel or his representative calls at or communicates with said office for the purpose of seeking an employee, they may select from the applicants present the one or more whom they wish to employ, or, in cases where they have no preference whatever as to the identity of their employees, the applicant who has first come to said office and who therefore has been assigned the lowest number, is given the first opportunity to present himself to such operator or his representative, either at said office if the operator has called there, or elsewhere if he has made his request by other communication. If and only if such applicant is satisfactory to his prospective employer and if such applicant desires to take such employment, then after the engagement has been made, the employee is furnished with a record book and reference card which are in the form and contain the matters and things set forth in the supplemental answer on file herein. Such record book, if it be thereafter returned to said office in connection with a later application of the same applicant for employment, is of val-

ue in enabling the applicant to furnish evidence of his record and in thus facilitating the determination by prospective employers at such later date as to whether or not such employer desires to employ the applicant who holds such record book. Said record book is also of value to the employee as a means of identification and in connection with naturalization proceedings and otherwise. During the time while an applicant is awaiting an opportunity to secure employment he is allowed to remain in the quarters provided for that purpose in said office and to enjoy the facilities there provided for rest and recreation. When a seaman is assigned by either of said employment offices to a vessel and he declines to take the employment and reports back to me or said offices or either thereof for work he is given his former number, that is to say, he is given the preference over those who have applied for employment since his original application, subject always to the provision that as to arrivals at different times there is no preference whatever in any case where the prospective employer desires a particular employee."

The form of reference or identification card, furnished applicants for employment when sent to a vessel, reads:

"Injuries Hurt You—Be Careful.

"Reference Card.

"San Francisco,..........
"To Captain of S. S. .......... Lying at
..........:
"In response to your order for ..........
we are referring to you for approval the applicant
Mr. ....:...............................
Application No. ..........
Service Record No. ..........
Serial Number ..........
"Marine Service Bureau,
"By ..........,
General Manager."

The reverse of this card reads as follows:

"Fill out and return to this office when seaman .......... leaves position.
"Date of Entry for Pay .......... Place
..........
"Date Left Position .......... Place
..........
"..........
"(Captain's Signature.)
"Notice—This card is to be received from seaman and is to be delivered, or mailed, direct to
"Marine Service Bureau,
"San Francisco."

With reference to what is referred to in the pleadings and testimony as the "Service Record," sometimes called the "Discharge Book," the witness Peterson testified: "At the time the card is given to the man and he is sent down to the ship we sometimes give him one of those service records or discharge books. When a man comes to our window to register the question is asked him then whether he has one, if he has the number is marked on the registration card; then when we hand him the gray card, the last one introduced in evidence, we give him this book if he has not got one. He is not required to take the book if he does not want to. If he does not take the book we send him down anyhow. This book entitled: 'Service record,' is the form of the book we have been using for some time."

Upon the cover of the book appears:

"Service Record.

"Marine Service Bureau.

"No. ————."

On the inside of the cover are blanks for the name of seaman, place and date of birth, personal description, previous experience and employers, rating and total years of sea experience, "Life-Boat Certificate," "A. B. Seaman Certificate," with date, number, and place of issuance. On the first and second pages of the book appear blanks for name and home address, and for data in respect to citizenship, personal characteristics, marks, etc., names and address of next of kin, and space for signature of the seaman. The third page contains blanks for name of vessel, owner, voyage, date and place referred to, position, rating, date and place of leaving employment. On the fourth page are blank spaces for the master's report respecting the ability and conduct of seaman, reasons for leaving employment, and signature of the master. Then follow 16 pages of the same matter appearing on pages 3 and 4. On the last page are blank spaces for filling in application numbers and dates.

The service record book above described and referred to in the testimony does not contain the printed matter set forth in paragraph VIII of the bill, nor is there any evidence to support the allegation that "as a condition of obtaining such employment they also compel all seamen * * * to take at a price of twenty-five cents for each book"— the evidence being to the contrary.

Concerning these books the witness Peterson testified: "There are about 54,000 of those books outstanding, and the value of the

book to the employer or the mate or the other officers of the vessel is they would be able to get all the information therein contained, and whether the seaman is complying with the law with respect to aliens going on coastwise vessels; and the value to the employee is, if he loses his lifeboat ticket or his A. B. certificate he has the numbers in the book and he can go over to the steamboat inspectors and get a new one; and it is beneficial to him for naturalization purposes and no vagrancy charge can be made against him for it shows that he is trying to make his living at sea. Many of the seamen who have applied for work at the bureau have expressed a desire to have these books; many of them value them very highly."

We quote with approval the following excerpt from the opinion of Judge Kerrigan in respect to the use of these books: "A similar wide variation among members to that appearing in the proportion of seamen hired through the bureau is shown in their present practices with regard to the service record or discharge book used by the bureau. The bureau now issues such books only to those seamen requesting them, although urging and advising seamen to take them. Many companies do not require that seamen hired by them present such books, and do not even ask whether they possess them. Other companies prefer that the seamen on their vessels have such books as a check on their employment records, but do not reject a seaman who has no such service record book, who is otherwise desirable. One or two companies do require their seamen to have these books. Among the reasons given by these companies are that the books are a convenient form of identification, and are used as dock passes, etc., as well as aids in keeping employment records, and that they afford a means of computing any bonus to which the seaman may become entitled by reason of the length of his employment."

The allegation in the bill that "the associations fix the wages which shall be paid the seamen" is wholly unsupported by the record.

The allegation that, "when a seaman's turn comes, he must take the employment then offered or none, whether it is suited to his qualifications or not, or whether he wishes to engage on the particular vessel or for the particular voyage," is also unsupported by the evidence. The testimony supports the conclusion of the trial judge that "the seaman also is free to refuse the employment if not satisfied with the ship or voyage offered." The testimony is to the effect that if the seaman upon investigation declines the job, upon so

reporting to the bureau he retains his number and order of priority.

The allegation that "the officers of the vessels are deprived of the right to select their own men, or those deemed most suitable," is without support in the record. The testimony in the main supports the conclusion that the contrary is the fact.

While not alleged in the bill, except possibly by inference, the record is free from any appearance upon the part of defendants, or the shipowners, of using the Marine Bureau as a means of blacklisting, or of discrimination as between union or nonunion seamen.

Some of the association members secure their employees in whole or in part from sources other than the bureau, while, on the other hand, it is patronized by owners not members of the association, including the United States Shipping Board.

During the year 1927 the bureau placed over 30,000 men. It is not surprising that in so great a number of contacts with individuals some would be dissatisfied with the system, or even occasional injustice to some individual occur; but this would not be a sufficient reason for holding the organization to be a combination in restraint of interstate and foreign commerce.

Counsel for appellants, in support of a contention that "defendants are dividing authority with Congress," cites section 4507, Rev. Stats., as amended (46 USCA § 549), requiring the Secretary of the Treasury to provide an office for the Shipping Commissioner for the shipment of discharged seamen, etc., and says "Defendants have a similar office." He cites section 4508 (46 USCA § 545), defining the duties of the Shipping Commissioner, and says, "Defendants' Bureau is doing that very thing." This contention was, we think, eliminated by the decision of the Supreme Court in commenting on the fact that the complaint referred to a number of statutes not involved in the question of the restraint of commerce. It is not shown or contended that the defendants in the operation of the Seamen's Bureau in any way interfere with the duties of the Shipping Commissioner. It is, of course, not contended that the Federal statutes cited occasion an unlawful interference with the liberty of contract of those engaged in interstate commerce. If, then, it be that defendants' bureau is doing the same thing as the Shipping Commissioner, or proceeding on similar lines, it could hardly be said that it was unduly restraining the freedom of plaintiff and other

seamen in engaging in commerce between the states.

Counsel for appellant quotes the following excerpt from the case of Patterson v. The Eudora, 190 U. S. 169, 23 S. Ct. 821, 47 L. Ed. 1002: "Contracts with sailors for their services are, as we have seen, exceptional in their character, and may be subjected to special restrictions for the purpose of securing the full ·and safe carrying on of commerce on the water. Being so subject, whenever the contract is for employment in commerce, not wholly within the State, legislation enforcing such restrictions comes within the domain of Congress, which is charged with the duty of protecting foreign and interstate commerce."

While the enforcement of restrictions prescribed by Congress comes within the domain of Congress, it does not follow that no other conditions, reasonable in character and not compulsory, may not be provided by shipowners.

The Supreme Court in its opinion, referring to the bill of complaint, page 362 of 272 U. S. (47 S. Ct. 126), said: "From these averments, the conclusion results that each of the shipowners and operators, by entering into this combination, has, in respect of the employment of seamen, surrendered himself completely to the control of the associations. *· * * But ships and those who operate them are instrumentalities of commerce and within the Commerce Clause no less than cargoes. Second Employers' Liability· Cases, 223 U. S. 1, 47–49 [32 S. Ct. 169, 56 L. Ed. 327, 38 L. R. A. (N. S.) 44]. And, as was said by this Court in United States v. Colgate & Co., 250 U. S. 300, 307 [39 S. Ct. 465, 63 L. Ed. 992, 7 A. L. R. 443], 'The purpose of the Sherman Act is to prohibit monopolies, contracts and combinations which probably would unduly interfere with the free exercise of their rights by those engaged, or who wish to engage, in trade and commerce—in a word to preserve the right of freedom to trade.' That the effect of the combination now under consideration, both as to the seamen and the owners, is precisely what this language condemns, is made plain by the allegations of the bill which we have just summarized."

It cannot be said, we think, that the evidence submitted in this case shows undue interference with the free exercise of rights of contract of employment between the sailors and the shipowners. Commenting upon the evidence in respect to the matter of the extent of patronage of the bureau, the opinion of the trial judge says: "While most of the members of the two defendant associations secure a large proportion of their seamen through the Marine Service Bureau, all of the members hire some seamen from other sources, who never register at the bureau. The proportion of men hired outside the bureau varies widely. In some instances it is a small percentage, but certain companies use the bureau only for 50 per cent. or less of their requirements. Two member companies do not use the bureau at all."

■ We think there is no merit in the contention that plaintiff in any event is entitled to a judgment upon his wages and damage claims. This contention is based upon the ground that following the decision of the Supreme Court of the United States, and prior to answer, the defendants changed the form of application for employment, reference card, and discharge book from those in use at the time the suit was instituted, and otherwise modified the method of doing business. The gist of the action, however, is for injunction authorized in proper cases under the Clayton Act (38 Stat. 730) and claims for damages are but incidental thereto. The question of injunction is determined by the facts existing at the time of trial. The court below did not err in refusing to go into the question of the form of documents in vogue at the time suit was instituted, to determine the moot question whether the case so considered, together with other possibly controlling facts, might at that time have established a cause of action which would have entitled complainant to an injunction, inclusive of a judgment for wages and damages. Decorative Stone Co. v. Building Trades Council (C. C. A.) 23 F.(2d) 426; Venner v. Pennsylvania Steel Co. (D. C.) 250 F. 292; Fleitmann v. Welsbach Lighting Co., 240 U. S. 27, 36 S. Ct. 233, 60 L. Ed. 505.

Judgment affirmed.