## NATIONAL LABOR RELATIONS BOARD v. MACKAY RADIO & TELEGRAPH CO.

### No. 8137.

Circuit Court of Appeals, Ninth Circuit.

Oct. 19, 1937.

For former opinion, see 87 F.(2d) 611.

Charles Fahy, Gen. Counsel, Robert B. Watts, Associate Gen. Counsel, Norman I. Somers, Senior, Litigation Atty., and Thomas I. Emerson and Stanley S. Surrey, Attys., all of Washington, D. C., for petitioner.

Louis W. Myers, of Los Angeles, Cal., J. Harold Merrick, of New York City, and Homer I. Mitchell, of Los Angeles, Cal., for respondent.

Before WILBUR, GARRECHT, and MATHEWS, Circuit Judges.

WILBUR, Circuit Judge.

My associates in this case adhere to the views they expressed and the conclusions they reached on the first hearing. These opinions are reported in 87 F.(2d) 631 and 632.

The opinion of the Supreme Court in National Labor Relations Board v. Jones & Laughlin S. Corp., 301 U.S. 1, 57 S.Ct. 615, 629, 81 L.Ed. 893, 108 A.L.R. 1352, and companion cases, sustain the constitutionality of the act in most of the aspects under attack in this case, and conformity with those decisions requires that I review the case from the standpoint of the validity of the Wagner-Connery Labor Relations Act (29 U.S.C.A. §§ 151–166). I refer to the opinions heretofore written for a statement of the facts.

Suffice it to say here that the five persons ordered re-employed with back pay were on a strike; that of sixty-nine members of the union who struck sixty-four were re-employed. The remaining five places had been filled by other employees of the respondent who had been transferred from Los Angeles and New York. The reason given for failure to re-employ the five persons whom the Board ordered restored to employment was that all vacanies were filled. Respondent contended that these persons were not re-employed because they delayed their applications for re-employment until after their places had been filled; that four of them were placed upon a list of eleven whose reinstatement was to be passed upon by the officers of the respondent in New York; and that the reason they rather than the other seven were not re-employed, was because of their delay in applying. The Board, however, was of the opinion, and so found, that the respondent so manipulated the list of eleven who were required to apply for reinstatement and so fixed the time for such application that these individuals were thus deprived of the privilege of reinstatement accorded the other members of the union. The conclusion of the Board is stated in the following portion of their findings:

"The inference seems clear that the respondent's officials readily perceived that circumstances had provided them with an excellent opportunity to rid the respondent of the leaders of the Local which had just caused it to pass through a costly strike and it did not fail to make the most of the opportunity. And in thus taking advantage of that opportunity the respondent committed a violation of the act. * * *

"We conclude that the four operators in question were placed on the list (of eleven) because of their union leadership and activity and therefore turn to the effect of that list upon the actions of the men named thereon. * * *

"These four were induced to postpone their applications because of the reasonable belief that they would not be permitted to return to work and that belief was planted in their minds by conduct of the respondent directed against them because of their union activities."

As to the respondent's refusal to re-employ P. D. Phelps, the fifth employee, the Board likewise refused to accept the explanation that Phelps was not reinstated because at the time he made application his position had already been filled, and concluded that the refusal of the respondent was a violation of section 8, subdivisions (1) and (3) of the act (29 U.S.C.A. § 158 (1, 3).

In its "Concluding findings of fact and conclusions of law," the Board states:

"2. By refusing to reinstate to employment A. B. Loudermilk, L. K. Bash and P. D. Phelps on October 8, 1935 and L. N. Rone and G. E. Palmer on October 9, 1935, thereby discharging said employees on the respective days, and by each of said discharges, the respondent did discriminate in regard to tenure of employment and has thereby discouraged membership in the labor organization known as American Radio Telegraphists' Association, San Francisco Local No. 3.

"3. By the acts described in paragraph 2 above, and each of them, the respondent has interfered with, restrained and coerced its employees in the exercise of the rights guaranteed in section 7 of the National Labor Relations Act [29 U.S.C.A. § 157]."

The Board further finds that the respondent has engaged in an unfair labor practice affecting commerce within the meaning of section 8, subd. 3, and section 2, subds. 6 and 7, of the National Labor Relations Act (29 U.S.C.A. §§ 152(6, 7), 158 (3).

In view of the decision of the Supreme Court in National Labor Relations Board v. Jones & Laughlin S. Corp., supra, and companion cases, holding that the Wagner Act is not in conflict with the Constitution, only two points remain to be considered. The first point is whether or not the order of the Board requiring the re-employment of the five former employees "is so arbitrary, capricious, unjust and unreasonable that it should be annulled for this reason alone." This question concerns the power of the court "to modify or set aside in whole or in part the order of the Board." Section 10, subd. (e), of the Act (29 U.S.C.A. § 160(e). The second question goes to the statutory power of the Board to order the re-employment of the five former employees. This proposition is thus stated by the respondent: "Even if the Act were constitutionally valid, the order of the Board requiring respondent to reemploy the five former employees, and to pay them wages for the period when they were not employees and rendered no services, was clearly beyond the power of the Board."

In view of the conclusion I have arrived at concerning this second proposition, it is unnecessary to consider the first or to exercise the discretionary power of the court in its enforcement order. Compare Federal Trade Comm. v. Curtis Pub. Co., 260 U.S. 568, 580, 43 S.Ct. 210, 213, 67 L.Ed. 408; International Shoe Co. v. Fed. Trade Comm., 280 U.S. 291, 50 S.Ct. 89, 74 L.Ed. 431.

The question of the statutory power of the Board I will now consider:

The respondent's argument on that question is as follows:

"The Board's decision is predicated throughout upon the assumption that these men were wrongfully 'discharged' by respondent. The Board purports to 'find' as a fact that they were so 'discharged' on October 8th and 9th, respectively. This purported 'finding' is purely a conclusion of law and is clearly erroneous. It is predicated solely upon the definition in section. 2(3) [of the act, 29 U.S.C.A. § 152(3)] defining the word 'employee' to 'include any individual whose work has ceased as a consequence of, or in connection with, any current labor dispute. * * *' It is conceded that Congress in enacting a statute may attach to a word used therein any definition it sees fit, and such definition must be accepted as conclusive for the purpose of interpreting that statute. It is equally clear that such a statutory definition has no effect whatsoever, except as an aid to the interpretation of that particular statute. Obviously, the Congress has no power, by mere legislative fiat, to create a fact or to change a fact.

"The obvious purpose of this definition in the statute was to provide that employees, while out on strike, shall be regarded as if they still were employees in fact, for the purposes of collective bargaining. Without such a provision in the Act, its collective bargaining provisions would fail utterly in the event of a strike. There is no good reason to suppose that Congress, by creating this definition, solely for the purposes of this statute, intended or attempted thereby to create the relationship of employer and employee where no such relationship exists in fact. Clearly, this would be beyond its power, and it is not to be supposed that Congress was attempting something so obviously futile.

"The relationship of employer and employee is a status which rests in contract, and can be created only by a contract, expressed or implied. Under our American Constitution, no legislative body has power to create a contract between two parties without the assent of both. When an employee quits his job and walks out and refuses to return to work, the result is either that he breaches his contract of employment or that he terminates it. If it is a term contract and the term has not expired, he breaches it,—and the employer, at his option, may elect to treat such breach as a termination thereof.

"If it is a contract at will, it is terminated by the mere act of the employee in quitting. In either case, the contract of employment has been terminated and the status of employer and employee no longer exists.

"The facts of this case, as found by the Board, show conclusively that the employment contracts of these five men were terminated on October 4th and 5th, respectively, by the voluntary action of the men in quitting their jobs. In fact, none of these men has been an employee of respondent at any time subsequent to October 5th. Therefore, the conclusion, that these men were 'discharged', is not merely contrary to the evidence; it is contrary to the facts as found by the Board itself.

"It follows that the order herein is beyond the power of the Board under the Act, even assuming the Act to be constitutionally valid. It requires respondent to offer 'full reinstatement' to each of these men and to pay to each the full amount of wages, during the period from October 9, 1935, to the date of such offer of 'reinstatement,' which he would have earned if he had been employed by and rendering full service to respondent throughout that period. (This amount to be reduced in each case, by the amount the man had earned in other employments, during the relatively brief period between October 9, 1935, and December 2, 1935, the date of hearing. Under the Board's order there can be no reduction on account of the earnings of these men during the period subsequent to December 2, 1935, however large those earnings may have been.

"The Board evidently predicated its action in this behalf upon a misinterpretation of that portion of section 10(c) [of the act, 29 U.S.C.A.: § 160(c)] which purports to authorize the Board by its order to require the employer to 'take such affirmative action, including reinstatement of employees with or without back pay, as will effectuate the policies of this Act.' It is submitted that this provision for 'reinstatement' of employees with or without back pay must be construed as applying only to such employees as have been wrongfully discharged. So construed, it would be entirely reasonable (assuming the Act be otherwise valid). An employee who has been wrongfully discharged has the right to treat his contract of employment as still subsisting, and to recover his wages thereunder, less what he may have earned in the meantime. This is a legal right and may be enforced by an action at law."

In dealing with this question on the previous hearing, I said:

"The case might be disposed of on the theory advanced by the respondent that the individuals who were ordered restored to their positions by the Board had themselves, by their voluntary act, ceased to be employees; consequently, that the act does not apply because the act authorized the reinstatement of employees and does not regulate the re-employment or the employment of laborers. Thus interpreted, the act applies only to a situation where the employer has discharged an employee against the will of the employee and his reinstatement is directed in consequence. But to base our conclusion upon that theory in the case at bar would require us to ignore the declarations in the act itself that employees on a strike are to be considered still as employees within the meaning of the act which declares the term 'employee' as used in the act to include 'any individual whose work has ceased as a consequence of, or in connection with, any current labor dispute or because of any unfair labor practice, and who has not obtained any other regular and substantially equivalent employment.' Section 2, subd. 3, of the act (29 U.S.C.A. § 152(3). Consequently, the Board was acting well within the power Congress sought to vest in it, and our decision must be based upon the broad ground that the act, according to its plain terms, is unconstitutional as violative of the Fifth Amendment in so far as it attempts to force upon an employer engaged in interstate commerce a contract of employment with those so engaged who have voluntarily terminated contract of employment.

"The order requiring the employment of the five individuals named is beyond the

power of the Board and cannot be enforced."

In none of the decisions of the Supreme Court involving the power of Congress to order a reinstatement of employees has the court gone so far as to sustain an order requiring the reemployment of persons who had terminated their employment by striking. Texas & N. O. Ry. v. Brotherhood of Ry. & S. S. Clerks, 281 U.S. 548, 50 S.Ct. 427, 74 L.Ed. 1034; National Labor Relations Board v. Jones & Laughlin S. Corp., and companion cases, supra. In the latter case Chief Justice Hughes, speaking for the court, said:

"The act does not compel agreements between employers and employees. It does not compel any agreement whatever. It does not prevent the employer 'from refusing to make a collective contract and hiring individuals on whatever terms' the employer 'may by unilateral action determine.' The act expressly provides in section 9(a) [of the act, 29 U.S.C.A. § 159(a)] that any individual employee or a group of employees shall have the right at any time to present grievances to their employer. The theory of the act is that free opportunity for negotiation with accredited representatives of employees is likely to promote industrial peace and may bring about the adjustments and agreements which the act in itself does not attempt to compel. As we said in Texas & N. O. R. Co. v. Railway & S. S. Clerks, supra, and repeated in Virginian Railway Co. v. System Federation No. 40 [300 U.S. 515, 57 S.Ct. 592, 81 L.Ed. 789] the cases of Adair v. United States, 208 U.S. 161, 28 S. Ct. 277, 52 L.Ed. 436, 13 Ann.Cas. 764, and Coppage v. Kansas, 236 U.S. 1, 35 S.Ct. 240, 59 L.Ed. 441, L.R.A.1915C, 960, are inapplicable to legislation of this character. The act does not interfere with the normal exercise of the right of the employer to select its employees or to discharge them. The employer may not, under cover of that right, intimidate or coerce its employees with respect to their self-organization and representation, and, on the other hand, the board is not entitled to make its authority a pretext for interference with the right of discharge when that right is exercised for other reasons than such intimidation and coercion. The true purpose is the subject of investigation with full opportunity to show the facts. It would seem that when employers freely recognize the right of their employees to their own organizations and their unrestricted right of representation there will be much less occasion for controversy in respect to the free and appropriate exercise of the right of selection and discharge. * * *

"The requirement of restoration to service of employees discharged in violation of the provisions of that act [Railway Labor Act, 45 U.S.C.A. § 151 et seq.] was thus a sanction imposed in the enforcement of a judicial decree. We do not doubt that Congress could impose a like sanction for the enforcement of its valid regulation. The fact that in the one case it was a judicial sanction, and in the other a legislative one, is not an essential difference in determining its propriety."

On the previous hearing I put my decision flatly upon the constitutional question; namely, the want of power in Congress to compel an employer to make a contract of employment. In so doing I assumed, contrary to the contention of the respondent, that the definition of the word "employee" contained in the Wagner Act applied to an employee on strike, as it clearly does, and said that the evident intent of Congress is to permit an order of reinstatement of such employees with back pay. Since our former decision in this case the Circuit Court of Appeals for the Fourth Circuit in Jeffery-DeWitt Insulator Co. v. National Labor Relations Board, 91 F.(2d) 134, decided June 16, 1937, has so held. As pointed out by Chief Justice Hughes, supra, speaking for the Supreme Court, in National Labor Relations Board v. Jones & Laughlin Steel Corp., the act does not require the employer to enter into a contract. If it did, it would be subject, no doubt, to the constitutional objections declared in the earlier cases to which he refers as not applicable (Adair v. U. S., supra, and Coppage v. Kansas, supra), which hold in effect that Congress cannot define the terms of a contract between employer and employee, nor require them to enter into a contract. The word "reinstatement" used in section 10(c) of the Wagner Act (29 U.S.C.A. § 160(c) must be construed in the light of this constitutional limitation upon the powers of Congress which would permit "reinstatement" of employees wrongfully discharged (National Labor Relations Board v. Jones & Laughlin S. Corp., supra) but would, in my opinion forbid a requirement of "reemployment"; that is, a new contract of employment. Moreover, as pointed out by the respondent the ordinary meaning of the word "reinstate" is "to place again in possession, or in a former state: to restore to a state from which one has been removed, to instate again."

Webster's International Dictionary. The order of "reinstatement" must therefore refer to the status of the "employee" at the time of the unfair labor practice which, in the case at bar, occurred after the strike. To reinstate such an employee to his status at the time the respondent was guilty of the unfair labor practice would be to require the respondent to recognize his right to collective bargaining. It is not contended that this right was denied them. I conclude that under the statute (section 10(c) properly construed in the light of the Constitution the power of the Board to order "reinstatement" of an employee does not authorize an order requiring the employer to re-employ at his former salary or wage, or otherwise, a striking employee who was on a strike and who had thus voluntarily terminated his right to salary or wages at the time the alleged unfair labor practice was committed by the respondent.

I therefore concur in the conclusion of Judge MATHEWS that the application be denied.

MATHEWS, Circuit Judge.

I adhere to the views expressed in my separate opinion filed January 11, 1937, 87 F.(2d) 631.

GARRECHT, Circuit Judge (dissenting).

In view of the opinion of the Supreme Court in National Labor Relations Board v. Jones & Laughlin Steel Corp., 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352, I feel that this court should grant the petition of the Board in this case and I dissent from any other holding.

To what was said by me in the first hearing, see 87 F.(2d) 611, 632–641, the following pertinent considerations may be added.

The order of the Board requiring reinstatement of the five striking employees of the respondent and payment to them of wages for the period subsequent to the failure to reinstate them was fully justified under the act.

If the employees ceased work on October 4, 1935 "as a consequence of, or in connection with, any current labor dispute," they retained their status as employees of respondent during the strike. Section 2(3) of the act (29 U.S.C.A. § 152(3) is as follows: "The term 'employee' shall include any employee, and shall not be limited to the employees of a particular employer, un-less the Act [chapter] explicitly states otherwise, and shall include any individual whose work has ceased as a consequence of, or in connection with, any current labor dispute or because of any unfair labor practice, and who has not obtained any other regular and substantially equivalent employment, but shall not include any individual employed as an agricultural laborer, or in the domestic service of any family or person at his home, or any individual employed by his parent or spouse."

The evidence and findings are clear to the effect that a labor dispute culminating in a strike occurred as a climax to protracted and unsatisfactory negotiations.

Following are excerpts from the findings of fact made by the Board:

"In September 1934 the San Francisco Local sent one of its members, Loudermilk, to New York for about a month to aid in the ARTA organization of the Mackay operators in that city in an attempt to prevent undermining of the San Francisco wage scale by payment of a lower scale in New York. In February 1935 an administrative Committee of the Local was appointed for the purpose of contacting all of the operators in the Mackay system, ARTA members and non-members, to ascertain their views on wages and working conditions. A lengthy questionnaire which covered these matters in detail was sent to the Mackay operators. After the receipt and compilation of this material, members of the Local prepared a general agreement concerning wages and working conditions for the entire Mackay point to point system. This agreement was sent to all of the ARTA locals and ratified by them. It was then presented by the national officers of ARTA to the Mackay officials in New York in June 1935. They requested and were given more time in which to consider the agreement in view of contemplated bankruptcy proceedings that might affect the Mackay companies. The agreement was again presented in September 1935. The national officers of ARTA had requested that the Local send O. M. Salisbury to New York to assist them in the negotiations since they were not too familiar with point to point conditions. Salisbury, who was chairman of the point to point division of the Local and an operator employed in the HB office, went East for this purpose. He was given a leave of absence, the reason for the trip being clearly understood by the respondent. At the same time, at a meeting of the Local held prior to September 1935, the members voted in favor of a

strike if such action became necessary to support their demands.

"The marine operators had also presented the Mackay companies with a system agreement. On September 13, Salisbury wired Bash, who was chairman in his place, that while the Radio Corporation of America had signed such a marine agreement, Mackay had refused and was recommending non-ARTA marine operators to the steamship companies. He suggested a special meeting to consider joint action on the two agreements. Rathborne, Secretary of the Local, Bash and Russ, who was marine superintendent of the respondent, conferred that morning on the question of recommending non-ARTA operators but reached no agreement. Stone, the new vice-president in charge of operations for the respondent happened to be in San Francisco that day. In the afternoon a number of marine operators and ARTA members of the point to point Mackay group of the Local conferred with Stone. The marine agreement was discussed to some extent, Stone pointing out defects in the agreement RCA had signed. The point to point ARTA operators stated that they were considering joint action on the two agreements. Stone replied that he was taken by surprise and requested time to return to New York to study the point to point agreement. The request was granted. That evening a joint meeting of the marine and point to point members was held and a resolution adopted to the effect that the two divisions should unite for joint action on the two agreements, so that one could not be adopted to the exclusion of the other, and that the Mackay officials should have until September 23 to execute the agreements unless the ARTA officers negotiating such agreements believed negotiations were proceeding in a satisfactory manner. The vote was overwhelmingly in favor of the resolution, only three or four voting against it. In view of the strike vote taken at the meeting prior to September 1, the action taken at the September 13 meeting was really the fixing of a deadline at which the ARTA officers could call a strike if they deemed one necessary. At this time nearly all of the HB operators were members of the Local. As the ARTA admitted supervisory officials to membership, some of the supervisors in that office were also members.

"B. The October 7-8 Strike.

"On October 4 the ARTA negotiators in New York decided that a strike was advisable in view of the unsatisfactory state of the negotiations. Salisbury telephoned the Local and a meeting of the point to point group was held that evening. The strike had been set for 12 o'clock midnight, San Francisco time, and was to be nation-wide over the Mackay system. A strike committee for San Francisco was appointed at the meeting. At midnight all of the HB office force then on duty went on strike, with the exception of the official in charge."

These findings being supported by evidence are conclusive. The act (section 10 (e), 29 U.S.C.A. § 160(e) provides: "The findings of the Board as to the facts, if supported by evidence, shall be conclusive." See National Labor Relations Board v. National New York Packing & Shipping Co. (C.C.A.) 86 F.(2d) 98.

In his first opinion Judge Wilbur conceded this contention of the Board and pointed out that the position of Judge Mathews was untenable, in this language:

"The case might be disposed of on the theory advanced by the respondent that the individuals who were ordered restored to their positions by the Board had themselves, by their voluntary act, ceased to be employees; consequently, that the act does not apply because the act authorized the reinstatement of employees and does not regulate the re-employment or the employment of laborers. Thus interpreted, the act applies only to a situation where the employer has discharged an employee against the will of the employee and his reinstatement is directed in consequence. But to base our conclusion upon that theory in the case at bar would require us to ignore the declarations in the act itself that employees on a strike are to be considered still as employees within the meaning of the act which declares the term 'employee' as used in the act to include 'any individual whose work has ceased as a consequence of, or in connection with, any current labor dispute or because of any unfair labor practice, and who has not obtained any other regular and substantially equivalent employment.' Section 2, subdivision 3 of the act (29 U.S.C.A. § 152(3). Consequently, the Board was acting well within the power Congress sought to vest in it, and our decision must be based upon the broad ground that the act, according to its plain terms, is unconstitutional as violative of the Fifth Amendment in so far as it attempts to force upon an employer engaged in interstate commerce a contract of employment with those so

engaged who have voluntarily terminated contract of employment."

In his present opinion Judge WILBUR has receded from his former stand and now accepts the argument as set forth in respondent's brief.

In his opinion on the petition for rehearing, Judge WILBUR asserts that under the Jones & Laughlin decision employers cannot be required to enter into a contract with their employees or any of them; that only when an employee has ceased work by reason of an unfair labor practice can reinstatement be required without forcing a new contract; that when, as in the instant case, work ceased before the unfair practice took place, to require reinstatement of the employee to the position he held directly before work ceased is to force the employer to make a new contract, hence beyond the legitimate scope of the act.

This view appears to me to be a strained construction designed to nullify the National Labor Relations Act in an important field of its operations. If section 10(c) of the act (29 U.S.C.A. § 160(c) empowering the Board "to take such affirmative action, including reinstatement of employees with or without back pay, as will effectuate the policies of this Act [chapter]," operates only in those cases where unfair labor practices occur without or before a strike, then, obviously, an employer at the conclusion of a strike may by an unfettered selection of men discriminate against those who are most active in union affairs.

The reasoning which dictates this stultifying conclusion leaves me cold. Because employment is a matter of contract, it is said, to compel the hiring of a man who has ceased work for reasons other than an unfair labor practice is to compel the making of a new contract.

The argument overlooks the fact that the relationship of employer and employee, while initiated by contract, is a status the incidents of which may be altered by the Legislature under its police power. In the field of interstate commerce it is the Congress which exercises this police power.

Examples of relationships originating in contract whose incidents are subject to legislative alteration are numerous.

The status of seaman and vessel, resting in and originated by contract, may be modified by Congress to the extent (to cite one example among many) of prohibiting the payment of wages in advance. Patterson v. The Eudora, 190 U.S. 169, 175, 23 S.Ct. 821,

47 L.Ed. 1002. The status initiated by the contract of employer and employee in an industry subject to state regulation may be altered by abolishing the employee's right to sue for injuries and substituting therefor a system of workmen's compensation. New York Central R. Co. v. White, 243 U.S. 188, 206, 37 S.Ct. 247, 61 L.Ed. 667, L.R.A. 1917D, 1, Ann.Cas.1917D, 629; Chicago, B. & Q. R. Co. v. McGuire, 219 U.S. 549, 571, 31 S.Ct. 259, 55 L.Ed. 328. Likewise, in an interstate commerce industry, Congress may alter the status of the employment relationship by abrogating certain of the common-law defenses of an employer against suit for damages brought by an employee. Mondou v. New York, etc., R. Co., 223 U.S. 1, 32 S.Ct. 169, 56 L.Ed. 327, 38 L.R.A.(N.S.) 44.

By the passage of the National Labor Relations Act in July 1935, several months before the activities pertinent to this decision occurred, Congress undertook to add certain incidents to the status originating in the contract of employment in industries subject to its control of which the Radio and Telegraph industry is an outstanding example. One of these added incidents is the continuance of the employer-employee status during the cessation of work caused by a labor dispute. Section 2(3) of the act, supra (29 U.S.C.A. § 152(3). Another arises from section 10(c), as follows:

"If upon all the testimony taken the Board shall be of the opinion that any person named in the complaint has engaged in or is engaging in any such unfair labor practice, then the Board shall state its findings of fact and shall issue and cause to be served on such person an order requiring such person to cease and desist from such unfair labor practice, and to take such affirmative action, including reinstatement of employees with or without back pay, as will effectuate the policies of this Act [chapter]. Such order may further require such person to make reports from time to time showing the extent to which it has complied with the order."

When we consider the purpose of the act, this must be construed to mean that, if work ceases in consequence of a labor dispute and the employer, upon the resumption of work, selects the men to reman his plant with a view to discriminate against or hamper labor union activity, he may be required to reinstate those discriminated against to the positions held by them at the time work ceased.

This is the construction of the act which most tends to effectuate its policies. The act, so construed, is clearly constitutional unless it can be said, beyond a reasonable doubt, that the addition of such an incident to the employment status cannot conceivably promote the welfare of interstate commerce. Ogden v. Saunders, 12 Wheat. 213, 269, 6 L.Ed. 606; Sinking Fund Cases, 99 U.S. 700, 718, 25 L.Ed. 496; Lindsley v. Natural Carbonic Gas Co., 220 U.S. 61, 78, 31 S.Ct. 337, 55 L.Ed. 369, Ann.Cas.1912C, 160; Williams v. Mayor and City Council of Baltimore, 289 U.S. 36, 42, 53 S.Ct. 431, 433, 77 L.Ed. 1015; U. S. v. Butler, 297 U. S. 1, 67, 56 S.Ct. 312, 319, 80 L.Ed. 477, 102 A.L.R. 914.

The promotion of collective bargaining in industries subject to the power of Congress has been determined to be within the field of congressional action. Certainly it cannot be deemed a "fanciful conjecture" (Borden's Farm Products Co. v. Baldwin, 293 U.S. 194, 209, 55 S.Ct. 187, 191, 79 L. Ed. 281) that the prevention of discrimination by requiring the employer to reinstate an employee to the position held before a strike which gave the employer the opportunity to practice discrimination will operate to promote and strengthen collective bargaining.

Therefore I am of the opinion that the Board's order was proper. It obviously follows that the order for payment of wages from the date of the unfair practice was also within the Board's jurisdiction.